CITIZENS' ST. R. CO. v. CITY OF MEMPHIS et al.

(Circuit Court, W. D. Tennessee. January 4, 1893.)

No. 455.

1. COURTS—FEDERAL QUESTION—IMPAIRING OBLIGATION OF CONTRACT IN CORPORATE CHARTER.

Before the adoption of Const. Tenn. 1870, art. 11, § 8, which required the general assembly to provide by general laws for the organization of all corporations thereafter created, "which laws may at any time be altered or repealed," certain street-railroad companies had been incorporated, and authorized to construct and operate street railways on all or any of the streets in a certain city, without any reservation of power to alter or repeal their charters. After the constitution of 1870 took effect, these companies became consolidated into one corporation, pursuant to Mill. & V. Code, §§ 1263–1272, providing for consolidation of railroad companies, made applicable to street-railroad companies by Act March 26, 1887. *Held,* that, no intention to subject the previously existing charters to alteration or repeal appearing in the constitution of 1870 or the subsequent legislation, the consolidation did not subject rights granted by the original charters to the dominion of the state, and neither the state nor the city, under authority delegated by the state, could prohibit the consolidated company from occupying a street in the city, in the exercise of the right granted by the original charters; and, as such prohibition would impair the obligation of those charters, a suit by the consolidated company to restrain the city from interfering with such use of the street by the company involved a federal question.

2. HORSE AND STREET RAILROADS — CHARTER AND FRANCHISES — MUNICIPAL CONTROL OF STREETS.

The right of a city, under or independently of its charter, to regulate and control the use of its streets, does not empower it to prohibit a street-car company from occupying and using a street for the purpose of a street railroad, in the exercise of rights conferred on the company by its charter.

3. SAME—ABANDONMENT.

A street-car company, which, under authority of its charter, had constructed and operated street railways on certain city streets, entered into a contract with the city to re-establish itself upon the streets with electrical power, instead of animal power, within two years. One of the streets included in the contract had been used by the company for a spur track and turntable only, and in the construction of the new tracks no track into that street was laid or was proposed until after the company had obtained the surrender to itself, by the city, of bonds deposited as security

for the completion of the system and compliance with the contract. *Held*, that these facts, the two years limited by the contract not having expired, did not show an abandonment of such street by the company, nor preclude it from making use of the street, at any time within the two years, to the full extent of the right granted by the charter.

In Equity. Suit by the Citizens' Street Railroad Company against the city of Memphis and W. L. Clapp, president of said city, to restrain defendants from interfering with plaintiff in constructing tracks for its electric railway on West Court street, in said city. On motion for preliminary injunction. Granted.

Turley & Wright, for the motion.
Metcalf & Walker, opposed.

HAMMOND, J. · The troublesome question in this case is that of our jurisdiction. The defendant city contends that the power to alter or repeal the charter of the plaintiff company is absolute, and, therefore, that there can be no inviolable obligation of the contract, arising out of the charter, to be protected by the federal constitution, which forbids any state to pass a law impairing the obligation of contracts; wherefore it contends that no federal question is presented to sustain our jurisdiction, and that whatever rights the plaintiff may have, either of property or action, or whatever injuries it may have received at the hands of the city authorities, are matter ; solely within the jurisdiction of the state, and cognizable only i its tribunals, like all other rights or injuries with which the federa authority has no concern. If it were certain that the state ·had the power to alter and repeal the plaintiff's charter at will, I should be inclined to take the defendant's view of this question, and hold that, so far as this particular article of the federal constitution is concerned, no federal question could be presented, under such a charter; because what the state might do of itself it could do by its municipal agencies as well, and whether or not the state had authorized such an agency to do such a thing as that complained of, or whether or not the state had the power, under its constitution, to confer such authority on the given agency, and the like, would present no federal question, but one only of the law of the state, apart from its connection with the other. There are intricacies of this subject, I know, arising out of the consideration that it is impossible to take any contract—or its obligation, rather—out of that protection afforded unreservedly by the federal constitution to all contracts, whether they be private contracts, purely, or charter contracts, by special or general law, and that this impossibility necessarily imposes always a federal inquiry whenever complaint is made that the obligation—whatever it be, much or little—has been impaired by state legislation. Whether a reservation—for example, to alter, amend, or repeal a charter—is operative to protect the particular legislation against the imputation of federal prohibition may be, it .is said, itself a federal question to support the jurisdiction; just as in a purely private contract there may be a reservation of power of revocation to either party; but it does not follow that the state, because of such reservation, may pass a law impairing the obligation

of that class of contracts, or that the class is exempt from the influence of the federal prohibition. But I do not care, at this time, to go into these intricacies of constitutional construction. Charters of incorporation are peculiar contracts, which have been—by grace or favor, it has been said by some—placed upon an equality with private contracts in this matter of federal protection against state legislation impairing their obligation, by the celebrated Dartmouth College Case; and it has been generally thought that the state might avoid the tremendous restrictions placed by that case upon their authority over corporations, and retain to themselves what many believe to be a wise power of absolute dominion, by agreeing with each incorporation at the time of the charter, as a part of the contract, and of its obligation, that this power of absolute dominion should exist, and the state be at liberty, whenever it chooses, to not only impair the obligation of the charter contract by amendment or other alteration, but, by repeal, to destroy it wholly; or, by importing such a reservation of power into all charters, by a constitutional provision to that effect, to preserve this absolute dominion over them. Water Co. v. Clark, 143 U. S. 1, 12 Sup. Ct. Rep. 346. Under such a charter it would seem that no federal question could arise, as to impairing its obligation, for the plain reason that the power to do that thing is reserved. Whether the state has exercised the power or not, or whether the state has or has not, in fact, authorized one of its municipalities to exercise the power for it, or whether the particular action of the municipality comes within its granted powers, and the like, are all, under such a charter, mere questions of state law, with which the federal constitution can, in the nature of the thing, have no concern whatever. It may be that such a state of law, and such absolute dominion, would make corporation property and franchises unsafe and unstable, but that is an infirmity of the state law, and not of the federal constitution, and investors would consider that infirmity when making their investments; but, justly, they could not rely upon federal authority for help in their distress upon the question whether the state had or had not injured their property and franchises, whether it had left them in full enjoyment of these franchises, or armed its agencies with powers to injure them. These would not be federal questions at all. I say, again, the fullness of this doctrine, as contended for by the defendants' counsel, will be conceded by the court here, for the purposes we now have in hand. But I do not think the plaintiff's charter is subject to such absolute dominion by the state, and perhaps no charter can be, whether before or after the constitution of 1870; but of that we need not inquire at this time.

The plaintiff company owes its origin to two companies,—one chartered in 1865, known as the Memphis City Railroad Company, and the other chartered in 1866, known as the Citizens' Street Railroad Company. These charters, of course, were unaffected by the constitutional provision of 1870, now under consideration, and were fully under the protection of the federal constitution, in the matter of the inviolability of their charter contracts. How have they lost this advantage, if at all? It is said that by consolidation into one com-

pany a new corporation has been formed, the old ones dissolved, and the new brought within the constitutional reservation of the power to alter, amend, or repeal a charter, and thereby subject to this absolute dominion which the state has reserved over all charters granted since 1870; and to support this position a class of cases to be presently noticed is relied upon by the city. Undoubtedly this result must follow, if the legislature has intended it, and if it has the constitutional power to effect that intention. Nothing in the legislation, by express terms, manifests any intention to deprive the old corporations of the advantage of any right or immunity that they had under their charters, but, upon the contrary, they are all expressly preserved to them, notwithstanding the consolidation. Necessarily a consolidated corporation must be, in a certain sense, a new corporation; but not necessarily, in every sense, nor in the fullest sense, must it be so entirely new that the old corporation is extinct. There is nothing in the nature of the subject-matter, nor of the process of consolidation, that requires this extinction of the old corporations to make the new. It may be done, or it may not. Whether it be desirable to the state and the corporations involved, or to either party to the contract, to extinguish the old charters entirely, or to preserve them in whole or in part, depends upon the circumstances, and whether they have agreed to that extinction or not, for, be it remembered, it is a matter of agreement between them,—depends upon the nature and character of the purposes they have in view in effecting the new arrangement. Now, is it to be supposed that these old companies desired or were willing, for the mere privilege of consolidation, to surrender their old charter rights including that involved here of inviolability of the contract, or that the state, in consideration of the grant of that privilege, imposed such a surrender upon them? Naturally, if the consolidation could be constitutionally effected without this, the companies would desire it, and, if they have surrendered that inviolability, such purpose would be manifested in the legislation itself, and not left to implication; and, on the other hand, the state would have insisted that the surrender, and the intention to impose it, should be plainly manifested and secured by the agreement—that is to say, by the legislation—itself. Contrary to this, as I shall undertake to show presently, the form of the legislation, its historical surroundings, and its appearances of substance and phraseology, are all against the idea of any open and unconcealed purpose of both parties to this agreement of consolidation that the old charters should be surrendered, in the sense that they became extinct; or of the state, that it would, in open and unconcealed terms, impose this surrender as a consideration for the newly-granted privilege of consolidation; and there seem to be provided the appliances necessary for the convenience of the companies which enable them to obtain the benefits of administration through one company, rather than two, such as a new name or a consolidated name, and a privilege of being a new corporate entity, instead of a double-headed concern, and the like, the possession of which would not be inconsistent at all with a retention of all its rights, immunities, and privileges; including again, I say, this more

valuable one, of inviolability of its charter rights, and, incidentally, (and I say this particularly because it is, in my judgment, only an incident, and in the just sense a quite unimportant and immaterial one, but still one especially involved here,) the supplemental option of appealing to the federal tribunals to protect that inviolability. The truth is, if any surrender has taken place, it is by implication only; and that implication arises out of the operation and effect of the constitutional provision upon that which the parties have done in a form which is wholly inconsistent with the notion that they intended, on the one hand, to impose the surrender, and on the other to accept it.

But, before going into the legislation with this purpose in view, it is best to consider somewhat further the powers of the state in that behalf. Apart from constitutional restrictions, the legislature, having the most plenary power of providing for the consolidation of companies to make a new corporation, with new rights and privileges, or partly new and partly old, may preserve the old in whole or in part, in substance and in fact, and clothe the old corporation with a new name, and, if necessary, with all the incidents of a new company, which is to possess absolutely all the old rights, immunities, and privileges, including the inviolability of these charter rights. Indeed, the legislation should not violate the chartered rights, which would be to violate the federal constitution, and this immunity of inviolability it cannot touch without the consent of the old company, however plenary the powers of the state may be under its own constitution. Where have these companies ever consented to surrender this inviolability, and where is the evidence of it? If at all, it can only be by implication upon this new constitutional provision in relation to future corporations, and from the fact that they have accepted the importation into their charters of a clause that they shall be subject to any alteration, amendment, or repeal by the state, and the vehicle of this importation is this eighth section of article 11 of the constitution of 1870. In other words, they have agreed, by consolidating under a general law, that the legislature may at any time repeal their charters, which were before the agreement irrepealable. This is a stupendous result, which the ordinary rules of statutory construction would forbid that we should impose upon a party to a contract by any implication not clearly necessary, from the nature, terms, and scope of the agreement itself. Think for a moment what these companies have done. For the relatively paltry consideration of a consolidation, which has, by its very words and clearly-manifested intention, added not one iota of chartered privileges of any kind, except the privilege of uniting into one company instead of remaining two, they have agreed to permit the legislature to repeal hitherto irrepealable charters, and drive the two companies out of existence, at its will; take the streets away from them, and give their use for city transportation traffic to another, if it chooses; and this, too, when, with some inconvenience, the two companies might have continued to exist and get along very well without consolidation. It is obvious to my mind that this was not a result understandingly

agreed upon between the state and these two companies, nor was the legislation out of which the result arises projected upon an understanding between the legislature and the companies that it would be a necessary consequence of the proposed consolidation. There was, in fact, no necessity whatever for any legislation like this. general law of consolidation, if that was to be its effect. All that was needed was to organize a new company under our general law for chartering street railroads, and make under that law the contracts that were made with the city.

The very existence of this special act (in a certain sense) for organizing new companies by the consolidation of old is a protest against the notion that the old charters have been surrendered for a new charter, when there was already a general law for new companies amply sufficient for such a purpose. Again, possibly this general law for the organization of street-railroad companies, applicable to all companies wishing to avail themselves of it, is the only kind of law the legislature has the power to pass, under this very constitutional provision we have in hand; for how can the legislature, by a general or special law, grant privileges and immunities to old corporations not granted to any that are new, or to new corporations made out of old ones not granted to new corporations made de novo,—if this legislation for consolidation is to be taken as a general law, having the effect to create an absolutely new corporation, stripped of its old charters, and the old charters extinguished? We must not be confused by terms. Such a law would be a special act, in effect, though general in appearance; granting to one class of citizens—the fortunate possessors of old charters, namely—special privileges, not granted to a less fortunate class of citizens,—those possessing new charters under the general law, namely. The legislature, under such a construction of this provision of the constitution as the city claims, would have no more power to confer, by general law or otherwise, upon a new corporation made by consolidation out of old corporations, special privileges, than upon any other class of citizens, nor could it do this by reference to the old charters for a description of the privileges conferred more than by an apt description de novo, nor would the privileges so conferred be any less special because they are similar to, or identical with, other privileges conferred upon other companies by general or special law. They would come of a special law, in fact, however large or general might be its application to special individuals coming under it. The largeness of the class would not make class legislation any less special, and this is what is forbidden by the constitution. In other words, if the constitution and this legislation are to be construed as the city construes them, the legislation is itself unconstitutional. The legislature cannot confer, since 1870, special privileges upon a class by merely incorporating a provision in the new charter that it shall be subject to change or repeal by the legislature, nor can it confer such privileges by revamping old charters, and adding, by constitutional implication or otherwise, a clause to that effect. The existence of this clause in any way does not enlarge the power of the legislature in this respect of

legislating for a class to which others may not attach themselves. Let us illustrate this by supposing that companies A. and B. existed prior to 1870, as the plaintiff's predecessors did; that companies C. and D. exist, under our general street railroad act, since 1870; that company A. had the privilege, under its charter, of charging a fare of 10 cents, which is forbidden to the other three; that A. and B., under this street-railway consolidation act, become, as the city contends, a new company, E., with the old charters extinct, and useful only for reference, to learn by the description the privileges conferred by the consolidation act upon the new company, E.; and that E. charges, and there is conceded to it, the 10-cent fare. Is it not plain enough that, in the teeth of this provision of our constitution, a special privilege has been created, by a general law, forsooth, for a corporation created since 1870, which C. and D., to say nothing of all other street-railroad companies, cannot enjoy, unless the legislature gives it to them all alike by a general law forced upon it, because one company has it under such legislation as this, or else that the 10-cent fare is an unconstitutional grant to E.? What is true of this special privilege is equally true of all the other privileges which are special in the sense of being derived from special legislation, class legislation; that is to say, particular individual legislation it would be in the case supposed, although the privileges might not be special in the sense of being exclusive, as in the 10-cent fare case. If it be said that this was a grant under the old constitution, and, being good as such, remains good under the new, the reply is that it was not a grant to E. Moreover, B., one of the constituent companies, has acquired it by consolidation, and C. and D. are left out, and to that extent it is newly granted, at the very least. But if it be well granted because of the old constitution, to save the contention of the defendant here, why is not the old constitution equally available to save the contention of the plaintiff here,—that, although a new corporation, it has its old charter rights, including that of an inviolability of its charter contracts? And is it not equally plain that if the clause, "this charter may at any time be altered or repealed," should be written into the old charters by the pen of constitutional implication or otherwise, such insertion would not save the legislation from this constitutional objection? How can you write such a clause as that into an old charter? You may write it, and the constitution does write it, into a new charter; but this new charter, under this new constitution, must be, not a special charter, like the old, but a general charter for each and every corporation like it in business and purposes, or like it in conditions, and which shall be common to all coming within those conditions. You cannot make such a general charter by preserving the old special charter, and writing this clause in it. If the old charter is dead, or has no other function than that of description for new charters, then that description must cease to describe special rights, privileges, etc., for a particular corporation, and to describe rights, privileges, etc., for all similar corporations in the state, and all citizens must be free to procure a like charter, if they wish, and these privileges cannot be confined to individuals.

This legislation is not at all of that character, and was not so projected, as any one may see who reads it.

Again, it is one thing to write this clause into general laws organizing corporations hereafter created,—to use the language of the constitution,—and a stupendously different thing to write it into the old special charters of the state by any process whatever. So it is one thing to provide that the general laws authorizing the old special charter companies to consolidate shall be subject to alteration and repeal, and just as vastly a different thing to provide that their old special charters shall be subject to alteration and repeal. The constitution says nothing about the latter process, directly or indirectly; and, if the power to do that thing exists, it is upon an implication on a clearly expressed provision to secure the former of these two different things,—so vastly different, as I think, that they have no just relation to each other. I do not doubt the power of a constitutional convention to determine that the insertion of this saving clause of reservation of dominion over corporations is so important that it should forbid the legislature to pass any act, general or special, in relation to old charters, from which it had been omitted, unless, as a condition precedent to taking any benefit of such legislation, the old companies should agree that their charters should be so amended as to insert this clause of reservation. I only say I do not doubt this power for the purposes we have now on hand, for serious objections might be raised to such a prohibition, under our existing federal constitution; but I do say that in my opinion the constitutional convention of 1870 did not insert such a prohibition, or anything like it or akin to it, by section 8 of article 11 of that instrument. Nor do I doubt, in the same way, but that the legislature might adopt that policy, also, and determine, whenever it was asked to legislate for the benefit of the old charter companies, that it would withhold such benefit unless they agreed to amend their charters by the insertion of the dominion clause in them. But, likewise, I say that this legislation manifests no such intention, but, on the contrary, is, in form and purpose, upon the face of it, antagonistic to that notion, when read in the light of these views as to the relation of the parcels of legislation, constitutional and parliamentary, to each other.

Let us read them chronologically, for the purpose of comparison and contrast, and with the object of observing the intention displayed by fixing their relation to each other. First take the constitution of 1834, § 7, art. 11:

"The legislature shall have no power to suspend any general law for the benefit of any particular individual, nor pass any law for the benefit of individuals inconsistent with the general laws of the land, nor to pass any law granting to any individual or individuals rights, privileges, immunities, or exemptions other than such as may be, by the same law, extended to any member of the community who may be able to bring himself within the provisions of such law: provided, always, the legislature shall have power to grant such charters of incorporation as they may deem expedient for the public good."

Remember carefully that the first sentence of this article does not apply to the grant of charters of incorporation, they being saved by

the proviso, which left to the legislature the most plenary power as to them, while the first sentence of the corresponding section of the constitution of 1870 does apply to corporations, the proviso being omitted, and finding a substitute in the second sentence of section 8, art. 11, which we will now also read:

"The legislature shall have no power to suspend any general law for the benefit of any particular individual, nor pass any law for the benefit of individuals inconsistent with the general laws of the land, nor to pass any law granting to any individual or individuals rights, privileges, immunities, or exemptions other than such as may be, by the same law, extended to any member of the community who may be able to bring himself within the provisions of such law. No corporation shall be created, or its powers increased or diminished, by special laws; but the general assembly shall provide by general laws for the organization of all corporations hereafter created, which laws may at any time be altered or repealed; and no such alteration or repeal shall interfere with or divest rights which have become vested."

The proviso of 1834 remained, and yet remains, the foundation for all charters granted before 1870. Under article 1, § 10, of the constitution of the United States declaring that "no state shall pass any law impairing the obligation of contracts," as interpreted by the Dartmouth College Case, this first sentence of section 7 of the constitution of 1834 could not be made to apply to the two charters of the plaintiff company granted in 1865 and 1866, by becoming the first sentence of section 8 of the constitution of 1870, any more than it applied under the constitution of 1834; and it was not within the competency of the constitutional convention of 1870, by omitting the proviso, to let the bottom out of all old charters, and sink their corporations into the depths of death and oblivion. That proviso must always remain effective to sustain those charters, at least as to their foundation, if it does not remain by implication, as to them, for the broader purpose of conserving the public interest by permitting the legislature to legislate generally or specially as to them wherever the public interest demands. So remaining as a foundation only, those old charters are exempt from the operation on them of the first sentence of the constitution of 1870. Just as plainly it remains to exempt them, also, from the restrictions of its substitute of 1870 or the second sentence of that section, so far, at the very least, as those restrictions would operate to write in those charters the formulary that would restore to the state a dominion which it gave up by neglecting to insert the reservation clause to alter or repeal the charters. Only by their consent, expressed or implied, could these restrictions be applied to defeat the charter rights already existing. They might be made to apply to any amendments of the charters, but not the original instruments. Non constat that because the amendments are subject to alteration or repeal the original charters must be. By the terms of the section (if it applies to old corporations at all, which I doubt) their powers are not to be increased or diminished by special laws. Surely, if they need the increased power of uniting two of them into one, the power may be granted to the two by a general law admitting other like corporations, in like conditions, to the privilege, if they choose, and it cannot be granted by any special law conferring it upon these two; or, if they need an in-

creased privilege, of taking a new name for the consolidated entity, or of changing its organization of administrative machinery, and in that sense to be a new corporation, this additional privilege must also be granted by a general and not a special law, and this general law may be altered or repealed, and this is all there is of that. Non constat, again, that these changes or amendments or grants of increased powers and privileges by general laws, few or many, subject to repeal or alteration, have the implied effect (necessarily implied, I mean) of bringing the old charters into a moribund condition,— "dead as a door nail," as counsel expressed it in argument,— establishing an entirely new corporation, with a new charter, the whole of which is subject to alteration or repeal, or of writing a clause to that effect in the old charters, if, for any vital purpose, they remain in force in any respect whatever. So far from being a necessary implication, such consequences are not logically connected with the language used by the instrument, in my judgment.

Again, this section is confined to the "organization" of corpora tions "hereafter created," and it is these "laws" which are to be subject to alteration or repeal. Possibly this refers to corporations entirely new, and having no element of special existence under former laws, and excludes all the old corporations, so that they remain subject to the plenary power of the legislature under the old constitution, less the restrictions of the federal constitution, indeed, but otherwise unrestricted altogether. This construction might gather force from the very last clause—"and no such alteration or repeal shall interfere with or divest rights which have become vested." Possibly this, taken along with the phrase, "for the organization of all corporations hereafter created," indicates that the whole constitutional contrivance is to be taken as wholly excluding old charters from its operation, and leaving those corporations under the old law, and not under the new. But, whether this be so or not, certainly the entire language used, analyzed in this way, precludes the notion that the legislature has lost the power to consolidate old corporations under new names, and new organizations with their old charters intact, including their inviolability, under the federal constitution, and that, ipso facto, when such a new corporation is organized, it brings, by its own acceptance, its old charter under the bonds of this new constitution; that is to say, that this constitution drags the old charters under its wheels whenever there is any legislation about them that increases their powers by a general law. The power may have existed in the constitutional convention to do this, but it was not exercised in this section; and in my opinion the legislature of Tennessee still has the authority to deal with old corporations by general laws increasing their powers, and to permit them to consolidate and "be a new corporation" without in the least diminishing, by any necessary implication from that bare fact, their chartered rights, and that those rights may remain wholly intact, including the federal inviolability for the old charter, in such new corporation, and that in the absence of a clearly manifested intention to destroy the old charter, and create a new company with a new charter, this is essentially the intention of

any legislation on the subject, because it is the required, and abso-lutely necessary intention, unless the parties both agree to have it otherwise. It is the natural, logical, and congenital product of the two constitutions,—that under which the original creation was had, and that under which the changes have been made. The public interest, in any view we may take of it, requires that this power should be continued as to old charters and corporations rather than destroyed; and its destruction will not be presumed, upon such a section as this we have here. This sufficiently justifies the judg-ment as to the constitution.

Let us now turn to the legislation, and observe how it conforms to a belief in, and an intention to exercise, this very power in this very case, whatever other powers might have been exercised if the legislature had chosen. First let us read the two old charters,—that of the Memphis City Railroad Company, of June 7, 1865, and that of the Citizens' Street Railroad Company, of May 23, 1866:

### CHARTER.

"An act to incorporate the Memphis City Railroad Company.

"Section 1. Be it enacted by the general assembly of the state of Tennessee that William R. Moore, I. M. Hill, S. B. Beaumont, R. Hough, Wm. M. Far-rington, Frank Taft, G. P. Ware, S. R. Wood, Fielding Hurst, P. E. Bland, Joseph Bruce, Abner Taylor, Thomas R. Smith, H. B. Wells, Joseph W. Eys-tra, Wm. C. Bryan, W. P. Hepburn, and Frank Brooks, and their associates, be, and they are hereby, constituted a body politic and corporate, under the name and style of the Memphis City Railroad Company, and by that name may have succession for the term of thirty years; may sue and be sued, plead and be impleaded with; may have and use a common seal; may purchase and hold such personal and real estate as, in the opinion of the directors, may be necessary for carrying on the business of the corporation, and the same to sell and dispose of at pleasure; may make all needful by-laws for their government not inconsistent or in conflict with the laws of the state of Tennessee and the United States.

"Sec. 2. Be it further enacted that the capital stock of said company shall be three hundred thousand dollars, with the right and privilege on the part of said company to make it five hundred thousand dollars, which shall be divided into shares of fifty dollars each, and the same may be subscribed to and made subject to such calls and times of payment as said directors, hereinafter pro-vided for, shall designate.

"Sec. 3. Be it further enacted that the persons above named shall, within one year after this act, meet and elect five of their number, by ballot, to act as directors of said company, and thereupon said directors shall choose one of their number to act as president, and may elect such other officers as they may think necessary, and fix the salary of the same, said officers to remain in office one year, and until their successors shall be duly elected; and at the end of one year after the election of such directors, and annually thereafter, after thirty days' notice to be given by the president and secretary, or either of them, in a newspaper published in the city of Memphis, of the time and place of such election, the stockholders shall meet and elect five directors for the ensuing year, each stockholder to have one vote for each share of stock held by him or her. Said directors shall thereupon proceed to organize as above provided, for the organization of said board of directors, and so on annually during the existence of this charter. Said stockholders may vote in person or by proxy. Three of said directors shall constitute a quorum for the trans-action of business.

"Sec. 4. Be it further enacted that said company, by their said directors and officers, shall have power to make, complete, and execute all contracts and agreements entered into with the city of Memphis or other parties, for any purpose whatever, connected either directly or indirectly with the construction,

maintaining, or operating said railway, and may alter or enlarge the term of the same with said parties, and may construct, maintain, use, and operate street railways, by animal power, on all or any of the streets in the city of Memphis, in the state of Tennessee, for that purpose, using all necessary machinery and equipments: said company to use neatly constructed connections and safe cars, to be well adapted to such use and purpose; may enter into all necessary contracts for the building and operating of said railroad, and declare dividends on the capital stock of the same.

"Sec. 5. Be it further enacted that this act shall be so construed as to authorize said company to construct, maintain, and operate said railway in the streets of the towns or villages of Chelsea and Ft. Pickering, in all respects the same as in the city of Memphis: provided, that this act shall be so construed as not to grant either the indorsement of the state or the loan of any bonds.

"Sec. 6. Be it further enacted that each stockholder shall be individually liable to the creditors of said company, to an amount equal to the amount unpaid on the stock held by him, for all the debts and liabilities of said company, until the whole amount of the capital stock so held by him shall have been paid to the company, and all the stockholders of said company shall be jointly liable for all the debts due or owing to any of its laborers and servants for services performed for said corporation, but shall not be liable to an action therefor before any execution shall be returned unsatisfied in whole or in part against the said corporation, and then the amount due on such execution shall be the amount recoverable, with costs, against such stockholders.

"Sec. 7. Be it further enacted that said railroad shall be constructed on the most approved plan for the construction of street railroads, and shall be run as often as the convenience of passengers may require, and shall be subject to such reasonable rules and regulations in respect thereto as the common council of the city of Memphis may from time to time, by ordinance, prescribe, and to the payment to the city of such license, annually, for each car run thereon, as they may, by ordinance, prescribe; and the persons and their assigns are hereby authorized to charge at the rate of five cents for the conveyance of passengers for the whole or any part of the route from the depot to any terminus of said railroad.

"Sec. 8. Be it further enacted that whenever the said tracks shall be placed on the roads the same shall be laid with such rails and in such manner as shall not obstruct carriage travel, and said company shall cause said tracks to conform to the grade of the roads as they now are, or as it may be by them, and at their expense, changed or altered, and said company shall keep the surface of such roads, inside the rails, and for two feet outside, on each side thereof, in good order and repair.

"Sec. 9. Be it further enacted that the act entitled 'An act to incorporate the People's Passenger Railroad of the city of Memphis,' passed February, 1860, be, and the same is hereby, repealed, together with all acts and parts of acts inconsistent with this act.

"Sec. 10. Be it further enacted that this act shall take effect from the date of its passage.

    [Signed]  "William Heiskell, Speaker of the House of Representatives.
    [Signed]  "Samuel P. Rodgers, Speaker of the Senate.
"Passed June 7, 1865."

## AMENDMENT TO CHARTER.

Being twenty-fifth section of an act entitled 'An act to incorporate the Dandridge Railroad Company.'

"Sec. 25. Be it further enacted that the Memphis City Railroad Company, chartered June 7, 1865, is hereby authorized to exercise and enjoy all the rights, privileges, and franchises granted to any other street-railroad company in their charters for the city of Memphis or Shelby county, and that this act shall take effect from and after its passage.
"Passed March 9, 1867."

Under the foregoing amendment, the company have the rights and privileges contained in the following:

## CHARTER OF THE CITIZENS' STREET RAILROAD COMPANY.

"Sec. 4. Be it further enacted that R. Hough, J. E. Merriman, P. G. Woods, S. B. Beaumont, A. F. Kelsey, Spense Woods, Ross Griffin, be, and the same are hereby, incorporated a body politic, under the name and style of the Citizens' Street Railroad Company of Shelby county, state of Tennessee, and may sue and be sued, plead and be impleaded, have and use a common seal, buy, hold, and sell real estate, and enjoy all the rights and privileges usual to such corporations, for a period of fifty years.

"Sec. 5. The capital stock of said company shall be two hundred and fifty thousand dollars, divided into shares of one hundred dollars each; but said company shall have power to increase said capital stock from time to time, by a majority vote of the board of directors, to one million dollars; and said stock shall be transferable on the books of said company under such rules as the board of directors may enact.

"Sec. 6. Said company is hereby authorized to construct and run their railroad on any of the streets or highways of Shelby county, and are authorized and empowered to charge and collect from each passenger a sum not to exceed ten cents.

"Sec. 7. The corporators named in section 1 may open books for subscription to the capital stock; and, whenever there is subscribed fifty thousand dollars, said stockholders may proceed to elect a board of five directors from their number, and said board of directors shall elect from their own number a president, and such other officers as the board may, by their by-laws, designate.

"Sec. 8. Said company is hereby authorized to connect with, and run their cars on and over any track of, other street-railroad companies in the city of Memphis, by the payment of a reasonable amount for such privilege, and collect fare from each passenger in an amount not to exceed ten cents, as provided in section 6 of this act."

"Passed May 23, 1866."

Next we have what I shall call the "Street Railroad Charters Act," (Mill. & V. Code, § 1920 et seq.)

"1920. The form of a charter for a street railroad shall be as follows:

## "STATE OF TENNESSEE. CHARTER OF INCORPORATION.

"Be it known that [here copy the name of five or more corporators not under the age of twenty-one years] are hereby constituted a body politic and corporate by the name and style of [here insert the name,] for the purpose of constructing a street railroad in the incorporated town of [here insert the name of the town,] commencing at [here insert the initial terminus,] and ending at [here insert the terminus and the general route of the road.]

"1921. The general powers, etc., of said incorporators are [here insert the powers as declared in sections 1704, 1705.] The said company is authorized to consummate any contract with the city authorities of the town aforesaid, or with the county court, if the route extends, or is to be extended, beyond the limits of said incorporated city, or with private individuals, necessary to get the right of way along the public streets of the city, or along the public roads of the county: provided, that no one of the streets of said city shall be used by said company, nor shall any rails be laid down, until the consent of the city authorities has been first obtained, and an ordinance shall have been passed prescribing the terms on which the same may be done; or, if the said road extend into the country, the consent of the county court must be first obtained.

"1922. The company may operate said street railroad by animal power, or may use a dummy steam engine: provided, said engine shall not give off either smoke or steam so as to annoy or frighten either persons or animals. The company is at liberty to choose the gauge of the road, and the railroad track, cars, and coaches shall be used only for the transportation of passengers and personal baggage at a uniform price per head, which, for person and baggage, shall not exceed ten cents, or the fractional part thereof, from one to the other terminus of the road. In the construction of said road a tram rail only shall be used, and of such a description as to obviate danger of in-

juring wheels or axles of vehicles passing along and crossing said railroad tracks.

"1923. The company may issue bonds payable in such amount, at such times and places, as it deems best, with coupons attached for payment of interest, and may dispose of the same to raise money to construct or repair the road, and, to secure payment of the same, may mortgage the property, real and personal, and also the franchises, of the company.

"1924. Vehicles shall, at a proper signal, yield the right of way over the track and switches of said railroad to the passing cars, within a reasonable time; and it shall not be lawful to obstruct the free passage of the cars on said road, and any willful obstruction by any person shall be a misdemeanor. Priority of possession of the track is always to be given to fire engines and apparatus.

"1925. The powers herein granted are in no manner to interfere with the rights of private citizens or private property. The power is especially reserved to the incorporated city aforesaid to regulate the position of the switches or tunnels of said railroad in such manner as not to interfere with public travel through the streets; or, if the road is extended into the country, similar right is reserved to the county court."

Observe the differences between these two schemes of street-railroad corporations. Although there are many features alike, as to that which is granted each is separate and independent. The one is special, wholly, and would be impossible under the present constitution. The other conforms exactly, as a general law, to that instrument, and is, in my opinion, the only way that any new street-railway corporation can be now created. Other general laws, embodying a different scheme, might be made, and proposed incorporators might have a choice; but no law could be made especially for a class, no matter how that class arises,—whether by growth out of old corporations, or in any other way,—and any scheme, no matter what, which should take up the old corporations, and by any general law, no matter what its nature might be, undertake to make a special class, with general laws for its organization and powers, would be unconstitutional, under the new constitution, unless it does what I think it does,—permits the legislature to keep alive the old charters, supported by the old constitution, as to the vital parts of new companies organized for the very purpose of being clothed with these old charters. The point is worth noting again that if the state and these two old companies had intended, by their agreement for a reorganization, to do what the city insists was done, there was no need for any new legislation, and the new corporation should have been, and must have been, organized under this street railroad charter act. The necessity for, or the existence of, any other general laws, shows that some other kind of scheme or contrivance was essential. The one comprehends the "organization" of corporations "hereafter created;" the other, the reorganization of corporations already created, under more extensive powers of legislation than now exist. Organization and reorganization are different in every essential particular, and the same consequences do not necessarily follow in both. Now, then, we have, for the purposes of reorganization, another general law, subject to alteration and repeal, to be sure, but not from that fact alone destructive of the old charters. This destruction must come from some direct blow given, with the deadly intention of destruction, and not as a result of provisions for reorganization, which naturally

and ordinarily imply conservation, and not destruction. I shall call this general law the "Railroad Consolidation Act," and we find it in Milliken & Vertrees' Code, at section 1263 et sequitur; and note especially section 1268:

## "ARTICLE 111.

"Of the consolidation of railroads.

"1263. Every railroad corporation existing in this state under a general or special law, or under a general or special law of any other state ratified by this state, and having authority to operate and maintain a railroad in this state, shall have power to consolidate itself with any other railroad corporation whose road shall connect with, or intersect the road of, such existing railroad corporation, or any branch thereof. [Consolidations previous to March 12, 1875,—the date of the passage of the act,—were also ratified and confirmed by the act, provided all indebtedness existing at the date of such consolidation should be paid within sixty days from the passing of the act. 1875, c. 51, § 1.]

"1264. The agreement of consolidation shall be in writing, and shall set forth the corporate name agreed upon, and the terms and conditions of the consolidation.

"1265. The consolidation shall not have effect until the terms and conditions of the agreement shall have been approved by a majority of stockholders of each of the consolidating companies at a regular annual meeting. [This act also provides that the consolidation shall not take effect until such companies shall have paid all indebtedness due to the state for bonds issued to aid in the construction of the road. 1871, c. 69, § 2; 1877, c. 72, § 2.]

"1266. The agreement, together with the evidence of the stockholders' approval, shall be filed and recorded in the office of the secretary of state.

"1267. The rights of creditors of the consolidating companies shall in no wise be affected or impaired by such consolidation.

"1268. The corporation formed by the consolidation of two or more railroad corporations shall have all the rights, powers, privileges, immunities, and franchises, and be subject to all the duties and obligations, not inconsistent with the provisions of this article, conferred and imposed by the laws of this state upon such companies so consolidating, or either of them.

"1269. It shall have power (1) to fix the number of its directors, and the time of their election; (2) to fix the number, names, and duties of its officers; (3) to pass by-laws for the government of the company and the management of its affairs; (4) to fix the amount of its capital stock, which shall be divided into shares of $100 each; (5) to issue bonds, and dispose of same, in such form and denomination, and bearing such interest, as the board of directors may determine, and to secure the payment thereof by mortgage of every and all the property and franchises of said consolidated company, and of the companies from which it was formed; (6) and to do all other acts and things which the said companies so consolidating, or either of them, might have done previous to such consolidation.

"1270. No exemption from taxation of railroad property and franchises, and capital stock therein, contained in railway charters or other railway laws of this state, shall be transferred to, or conferred upon, such consolidated company, or the property and franchises and capital stock therein, of such consolidation of railroads, or of the property appertaining thereto, and used in the operation thereof.

"1271. No railroad company shall have power to give or create any mortgage or other kind of lien on its railway property in this state which shall be valid and binding against judgments and decrees, and executions therefrom, for timbers furnished and work and labor done on, or for damages done to persons and property in the operation of, its railroad in this state. [See section 1251.]

"1272. The state shall have the power by appropriate legislation to prevent unjust discriminations against, and extortions for, freights and passage over all railroads in this state."

The act of 1867–68, c. 72, § 1, provided that no railroads should be consolidated without the consent of three fourths of the stockholders.

The act did not confer the power to consolidate, but merely prescribed the manner in which the power, being assumed to exist, should be exercised.

By the very terms of this act, it is preservative, and not destructive. The consolidated company shall have all the rights, powers, privileges, immunities, and franchises conferred and imposed by the laws of this state upon such companies so consolidating, or either of them. The plaintiff company finds its muniment of title for its creation and powers in the laws of this state passed in 1865 and 1866,—its old charters, namely,—and not in this section 1268 of the railroad consolidation act. It finds that title, and all its other belongings, preserved to it, and some additional grants, perhaps, in this railroad consolidation act; but one had as well say that a substance chemically preserved in alcohol is created by the alcohol as to say that this plaintiff is created by this consolidation act. It is the same old creation in a new form, and was, beneficially to the public and the companies, presumably, in the wisdom of the legislature, intended to be preserved for the very purpose of continuing intact all its specially granted privileges, the more valuable now, and the more necessary to be preserved, because they are special, and can be no longer created anew, as special grants. This was, in my opinion, the sole purpose of this act. It was applied by the act of March 26, 1887, c. 189, to street-railroad companies as follows:

### "CHAPTER 189.

"An act to extend section 1263, and the sections following, down to and including section 1272, of the Acts of Tennessee, as compiled by Milliken & Vertrees, to street-railroad companies.

"Section 1. Be it enacted by the general assembly of the state of Tennessee that the provisions for the consolidation of railroads contained in section 1263 and the sections following, down to and including section 1272, of the Acts of Tennessee, compiled by Milliken & Vertrees,—said acts referred to in the caption,—be hereby declared to embrace and extend to any street-railroad corporations existing in this state, and to give every such street-railroad corporation the power to consolidate itself with any other such street-railroad corporation, where the road shall connect with or intersect the road of such a street-railroad corporation, or any branch thereof, in accordance with said sections: provided, that nothing in this act shall be construed to renew or extend the charter of either of said street-car companies in favor either of the original or consolidated company; and provided further, that nothing in this act shall be taken or construed to have any effect whatsoever upon any litigation now pending between the state and either of said street-car companies, or between the municipality in which the same is located and either of said companies: provided further, that nothing contained in this act shall be construed to in any way enlarge or control the rights that towns and cities now have by existing laws over their streets, alleys, or sidewalks, without their consent.

"Sec. 2. Be it further enacted that consolidations of such street-railroad companies made previous to the passage of this act are hereby ratified and confirmed to the extent of the provisions of the said sections of said Code.

"Sec. 3. Be it further enacted that this act take effect from and after its passage, the public welfare requiring it.

"Passed March 26, 1887."

This act adds nothing to, nor takes anything from, the other, and is quite unimportant to this controversy, although it has a somewhat curious phraseology in its provisos. These only more

forcibly, it seems to me, indicate an intention to preserve, and not destroy; to keep alive, and not to kill,—the old charters, although they do also carefully abstain from enlarging or diminishing the powers and privileges beyond the bare necessities of preservation. But there is nothing here to show any intention of bringing the old charters under the dominion of the legislature in the matter of altering or repealing those charters. This ends the legislation, and the argument upon it.

So far I have considered these laws without reference to the adjudications cited in the argument of counsel, but I find no constitution like ours, and no case like this. Undoubtedly the supreme court has, in a large list of cases, often decided that by consolidation the old constituent companies have been destroyed, an entirely new corporation created, and the effect was to let in the new constitution, and restore to the state that dominion over its taxing power which had been lost by a charter contract of exemption. Railroad Co. v. Berry, 113 U. S. 465, 5 Sup. Ct. Rep. 529; Railroad Co. v. Palmes, 109 U. S. 244, 3 Sup. Ct. Rep. 193; Railroad Co. v. Maine, 96 U. S. 499; Railroad Co. v. Georgia, 98 U. S. 359. On the other hand, the same court has held that this result did not at all follow in certain other cases, where the old corporations and their charters remained in force for the preservation of their immunities, etc., against the effect of dissolution and consolidation. Tomlinson v. Branch, 15 Wall. 460; Railroad Co. v. Georgia, 92 U. S. 665. Other cases might be cited, but these two are sufficient. They both hold that it is a question, in every case, of the legislative intent, to be gathered from the circumstances in each case, as shown by the legislation under which the consolidation takes place; and the former of the cases holds that the presumption is that the consolidated company preserves the original charter rights and burdens intact, unless the contrary is expressed.

Counsel for the plaintiff, since the argument, by supplemental brief, has undertaken to maintain our federal jurisdiction under the fourteenth amendment, contending that it is not within the competency of the state to destroy its property by legislative act. Possibly it is a full answer to this to say that such a holding would utterly nullify the constitutional or special reservation in a charter, of the power to alter or repeal it. If it may not destroy by repealing, there might not be much value in the power to repeal, and possibly the effect would be that by the charter contract the incorporators submitted to this tremendous power. Possibly, again, there might be a constitutional obligation, if repeal did take place, to compensate the incorporators by paying the value of the property so destroyed; but that is another question, and not a federal question at all, since nothing in the federal constitution requires such compensation. But I do not care to express any opinion on this fourteenth amendment, in its relation to this case, because I find our jurisdiction amply supported by what has been already said of the contract obligation clause in its relation to the case.

Finally, on this question of our jurisdiction, it must be noticed that we do not now finally decide these questions, or any of them, but only provisionally, for the purpose of this application for a preliminary in-

junction; and however they may be finally decided, whether in accordance with the views here expressed, or contrary to them, it is sufficient to say that the case fairly presents a federal question in presenting these for decision. I have no longer any doubt about our jurisdiction of this controversy, and this brings us to the question of its merits, which can be very briefly disposed of upon perfectly familiar principles.

That the plaintiff company has, by grant from the state, a right to occupy and use, in its business, any street in Memphis, the use of which it has not abandoned or surrendered by contract or other- wise, and that at the time it was obstructed by the city it had the right to so use West Court street, now in controversy here, by such grant, admits of no doubt whatever. If I am correct in the views expressed as to the effect of the constitutional provisions and the legislation we have been considering, there is just a little doubt that neither the state nor the city, acting under any delegated author- ity from the state, could take away this right of using West Court street by forbidding the plaintiff company to construct its tracks, as was done by the city. All acts of the legislature or municipal ordi- nances authorizing, directly or indirectly, such a prohibition, would be null and void, as against the federal constitution, which forbids such an impairment of its charter contract to construct, maintain, use, and operate street railways "on all or any of the streets in the city of Memphis." If the city charter confers this power of prohibition, it is to that extent void; if the municipal council assumes the power, and passes an ordinance authorizing the prohibition, as it did on the facts of this case, that ordinance is void; and if, under the municipal charter or the ordinances of the city, the municipal authorities as- sumed the power of prohibition as one belonging to their police con- trol, such authority would be likewise void. The city has by its ancient and modern charters, to be sure, the right to regulate and con- trol this use by the street-car company of the city streets. The franchises were granted subject to that power. And this would have been so without any special grant of the power of regulation to the city, and that power, in its more plenary quality, entered into the charter contract with the company, and became a part of it. Under it the city may, by ordinance,—possibly by contract, or both, and possibly without either,—under mere police oversight, regulate and control this use of the street in a thousand ways, such as determin- ing the kind of tracks, their location in the street, their connections, and the like; the running of the cars, and the like; the joint or simultaneous use by other street-railway or transportation companies, and the like; the use by others, such as water and gas companies, at the same time; the relation of abutting owners to the use; and, in- deed, all matters falling reasonably within the police power of regu- lation and control. But regulation cannot be enlarged into a power of prohibition, nor under it can the city usurp the state power of creating franchises or taking them away. If it has such power of cre- ation or withdrawal, independently of the power of regulation and control, the grant of it is, as to this plaintiff company, null and void. The plaintiff company can be deprived of its right to use any or all the

streets only by its own consent, express or implied; and we come now to that feature of this controversy, and it is of easy solution.

It is contended that the street-car company has abandoned the use of West Court street, upon the facts of this case. It is decided nowhere so well as by our own supreme court that, "to constitute an abandonment or waiver, there must be a clear, unequivocal, and decisive act of the party, showing a determination not to have the benefit in question, with full knowledge of his rights in the premises." Meigs, Dig. tit. "Abandonment." Breedlove v. Stump, 3 Yerg. 257; Gentry v. Gentry, 1 Sneed, 87; Traynor v. Johnson, 1 Head, 52; Masson v. Anderson, 3 Baxt. 290. Tested by this rule, there is not an unequivocal act of the plaintiff company shown by this record, in my judgment. Moreover, there is one fact which makes these acts, each and every one of them, perhaps less clear, more equivocal, and altogether indecisive of any intentional abandonment than any of them would be without that fact,—the two-years contract, namely. By this the company had two years to re-establish itself upon the streets with electrical power instead of animal power, and West Court street was one of those included in the contract. Until those two years shall expire, any fact relied on to show abandonment should be more clear, un- equivocal, and decisive than otherwise might be required, because the parties have fixed that time to determine what state of mind the plaintiff shall take in the matter of occupation and re-establishment upon that and all other streets. If it were possible to speak into existence such an establishment, the street-car company might have delayed all action until the last day, and the last minute of the day, and then saved itself by speaking the words to create the change from animal to electric power before the two years expired. The delay could not have been treated as evidence of abandonment if actual occupation should come, however late, within the two years. This is what the limitation as to time meant, and it is by contract the street-car company has two full years within which to make up its mind finally; and it might in the mean time change its mind as often as it chose, so long as, by some decisive act, it did not surrender the street, such as a specific consent to leave the street, expressly manifested for that purpose. That would be abandonment, understandingly, by clear, unequivocal, and decisive action. Scarcely anything less would be evidence of it, owing to this very limitation of time.

The fact that the company had, before the change from animals to electricity, made only a limited use of West Court street, as a spur track for temporary stoppage of cars, turntable uses, and the like, does not preclude it now from extending that use to the full extent of its inviolable grant from the state at any time within the two years allowed for the purpose under the contract with the city. It was a concession to the city to impose this limitation of time upon itself, and in that light its conduct will be most favorably construed for itself on this question of abandonment and finality of decision. Finality will not be imposed earlier than the time at which the two years expire, when, but for this concession, longer time might reasonably have been claimed before any implications based on lapse of time should be drawn against it in a question of abandonment. Similarly,

the fact that this spur and turntable use was abandoned for a turnout contrivance higher up town, and on Main street, itself does not show unequivocal abandonment of all use of West Court street. It might tend to show—somewhat feebly, perhaps—abandonment of that street for turntable and turnout uses; but, as both the Main street contrivance and the West Court street contrivance might both be useful for that purpose, it would hardly come up to the rule of unequivocal manifestation, even of that limited abandonment. Surely, it does not manifest abandonment of the more important and larger use now proposed, of making a loop track, for the convenience of a change of direction of travel, and the concentration of terminal facilities for taking on and letting off the travelers.

So of the fact that, in the process of construction of the tracks on Main street, West Court street was passed, and no provision made at their junction for a track into West Court street, as was done at the junction of Jefferson street and other streets; all this is equivocal, at least. Jefferson is a long street, containing an extensive route of travel; West Court, a very short street,—only two or three hundred feet,—not adapted, by itself, for a route of travel, like Jefferson street, but well adapted for a loop track, such as is now proposed, or a turnout track, such as was there before. The company may not have made up its mind to put in a loop track when it reached West Court street, nor whether it wished to put in turnout contrivances, nor whether it wished to go down to the river, or the like; but nothing in this contract required it to make up its mind as to these things when it reached West Court street, but it had two years for that purpose,—two entirely different limitations as to time; the one imposed by contract, the other not at all. If Main street, in its adjacent parts was constructed, as to tracks, pavements, etc., without reference to a possible change of mind within the two years allowed for that purpose, the only result is that it will cost the company more to construct on West Court street than it might have cost otherwise. This may show bad business management, but it does not show abandonment of the right to use West Court street for any purpose within the original grant, and its supplements, at any time within the two years.

So, too, as to the bonds deposited as collateral security to enforce the completion of the system and a compliance with the contract. Naturally the company would desire to recover the bonds at the earliest possible moment. Naturally, too, the city might be generously inclined to give them up as soon as possible. Under this impulse either or both may have disregarded the nonoccupation and incompleteness of construction as to West Court street; and in a matter so small as that, in relation to the vast establishment which had been so speedily constructed, the disregard would have been quite immaterial and harmless. This possibility makes the act equivocal, to say the least, on the question of abandonment. Again, it is so in view of a possibility that the company concealed its purpose to occupy West Court later on just to get back the bonds earlier. This would have been immoral, perhaps, but not a surrender of West Court street. Neither would such surrender be imposed as a penalty for the immo-

rality. The city might have compelled the restoration of the bonds, or had a suit for damages, or the like; but it could not enforce fair dealing in this behalf by a penalty of abandonment of all occupation of West Court street. To say the very least, the act appears equivocal and indecisive in this view. Again, the contract gave two years for its completion, and did not contain any limitation that the time should be shortened by the occurrence of any demand for the collateral bonds. It was the business of the city to keep the bonds for two years, until the contract was fully performed; and the act of the city in their surrender cannot be made to operate as evidence of abandonment by the company. The company's acceptance of the bonds, which all men do readily, could not be converted into an act of abandonment of the streets not completed in their occupation. It is not a fitting deduction from the act, unaccompanied by any express purpose of that kind, or inquiry as to West Court street by the city. The city should, in fairness, have asked the question if West Court street had been abandoned before surrendering the bonds, and not taken it for granted upon an implication based upon a demand for them by the company. Not doing this, it cannot predicate of the act a clear, unequivocal, and decisive abandonment by the company, understandingly made, of the right to use that street under its charter, for that is the source of the right, and not the grace or favor of the city; and this question is not to be determined as if it were by such grace or favor that the streets are used by this company, however it may be as to others.

Altogether, I think there is no evidence of abandonment, and the injunction will be granted, but upon a bond of $25,000, with the usual condition to pay such damages as the city may sustain by the wrongful suing out of this injunction, and an additional condition that it will surrender the street, if this suit be finally decided against the plaintiff, and the injunction dissolved, in the same condition as it was at the beginning of the occupation, free of all cost or expense to the city. Injunction granted.