## PEOPLE'S RAILROAD v. MEMPHIS RAILROAD.

A city invited bids for making a street railroad. Bids were made by an unincorporated company, and accepted; accepted, however, with a modification. To this modification the company agreed, expressing its readiness to sign a contract embodying the terms and conditions of it. The communication accepting the modification was referred to a committee; but no contract in form was ever signed. At this point of the matter the city passed a resolution giving permission to the unincorporated company to have themselves incorporated:

"The incorporation in no way to change the conditions of *the propositions heretofore made and accepted* by the parties respectively, the same being intended to secure the rights and more effectually preserve the remedies of parties against each other respectively, in case of any violation of contract to be *hereafter* entered into."

The unincorporated company accordingly got a charter, and so became an incorporated one. Its charter authorized it to *complete all agreements entered into,* with the city, for the use of the streets; AND, to operate street railroads in ALL the streets of the city *with the consent of the city.* The company, in its chartered form, now expressed to the city its readiness to execute their contract (which had been prepared by the city solicitor), and to enter on the construction of the road. This communication was referred to a committee. In the meantime opposition was made by the citizens to having rails in the streets, and the city resolved to recede from its project of having them, recognizing, at the same time, its " moral but not legal obligation to make good to those who had been incorporated as a street railway any real damage sustained by change of purpose."

*Held,*

1st. That there was no perfected contract between the city and the unincorporated company.

2d. That if there had been, there was no evidence that the city had accepted the incorporated company in place of the unincorporated one.

Error to the Supreme Court of Tennessee, the case being thus: .

The city of Memphis being by its charter empowered "to regulate the laying of railroad iron and the passage of railroad cars through the city," and by general law "to grant privileges in the use and enjoyments of the streets," passed, on the 11th of November, 1859, an ordinance prescribing the terms on which the board would grant the exclusive privilege of constructing street railways in Main Street, and other streets specially named, and operating them under certain regulations for a term of twenty-five years.

By the ordinance, bids were invited to be made, on or before November 20th, to the mayor and finance committee, and were to be reported to and awarded by a board consisting of the mayor and aldermen, at the first meeting thereafter.

Accordingly, on the 29th of November, the board met, and received from the finance committee a number of bids, including one from H. D. Small, William Kirk, and nine persons named, "and others, as the People's Passenger Railroad Company of Memphis;" the proposition being made by Kirk and Small as "business agents of the company." The committee reported that the bid thus made was the best one for the interest of the city; and the board proceeded to make their award pursuant to the ordinance. The bid thus reported on contained four propositions, each offering to pay certain amounts, fixed or contingent, for the privilege of running upon certain streets. The board made their award by authorizing the mayor and city attorney to close a contract with Kirk, Small, and the others, upon the terms of their second proposition as to the amount and time of payment, but including other streets, making a reservation of a right to determine the sort and weight of rail to be used, and varying the time of completion.

These modifications were accepted by Kirk and Small, in behalf of the persons composing the People's Passenger Railroad Company, December 2d, and a notice thereof, in writing, with great form and specification that they were so,

given to the board, and by the board, December 8th, " read received, and ordered to be filed."

. On the same 8th day of December, the board passed a resolution giving permission to the associates, describing them as " *the parties to whom has been awarded the contract for city railroads, under the ordinance passed the        day of        ,* 1859," to have themselves incorporated, " the incorporation in no way to change the conditions of the *propositions heretofore made and accepted by the parties respectively*, the same being intended to secure the rights and more effectually preserve the remedies of parties against each other respectively, in case of any violation of contract to be *hereafter* entered into."

On the 1st of February, 1860, that is to say about two months afterwards, Small, Kirk, and their associates were incorporated by the style of " The People's Passenger Railroad Company of Memphis," and by section 4 of their charter authorized to complete all the contracts or agreements *entered into* with the city of Memphis, or other parties, for the use of the streets of said city, and to enlarge and alter the terms of the same with said parties—AND *to operate street railroads,* by animal power, *in* ALL *the streets of said city, with the consent of the said city.*

Section 5 authorized the company to extend said road or roads outside the corporate limits.

On the 21st of February, 1860, the president and secretary of the People's Passenger Railroad Company laid before the board of mayor and aldermen a copy of their charter, and expressed their readiness to sign the contract which had been prepared for their signature by the city attorney. They say :

" We think that the same is in accordance with the agreement with the city as embodied in the ordinance on the bid and the resolution of grant. By a resolution of our board of directors under the charter which you permitted us to obtain, we are authorized to sign the contract, and hold ourselves in readiness to do so. . . . We are prepared to give the required bonds as soon as the contract is executed."

They express also their readiness to enter immediately upon the construction of the road, for which they say they had made preparations.

This communication was referred to a committee, with instructions to report.

In the meantime, opposition had arisen among the property-holders on Main Street, one of the streets named in the contract, and the committee recommended a postponement of action as to that street till March 20th, for the purpose of obtaining information as to the effect of street railroads on the value of property.

On the 22d of March the board resolved to recede from the undertaking to have a street railway on Main Street, recognized their "moral but not legal obligation to make good to *those who had been incorporated as a street railway* company any real damage sustained by change of purpose," and referred the matter back to the committee, "to modify the plans for street railways with the company, if it can be effected, or, otherwise, to agree on a settlement of the supposed damages, and report back to the board." No opposition appeared to have existed on any street but Main Street.

The committee and the company came to no settlement as to damages; and the committee made no report till the 23d of April, 1861, when they reported a resolution, which was adopted by the board, offering to sanction the construction of the road on any street, provided the consent of two-thirds of the property-holders thereon were first obtained.

The occupation of the city by the army during the rebellion, and the suspension of the courts, prevented any proceedings by the company either to obtain the consent of the property-holders or to enforce its rights by legal proceedings, and so the matter remained until June, 1865.

In the month and year last named, the rebellion being now suppressed, the legislature of Tennessee chartered a new company, to wit, "*The Memphis City* Railroad Company, with authority to construct, maintain, use, and operate street railways by animal power on all or any of the streets of Memphis," and to make all contracts and agreements

with the city or other parties in connection with the matter. And it repealed the act by which the *People's* Passenger Railway Company had been incorporated.

The new company having begun to lay its track on the streets of Memphis, and opposition being made thereto, on account of the former charter to the other company, the new company filed its bill in chancery, in a State court of Tennessee, the old company being made a defendant, to test the right of the matter. The old company set up as a defence to the bill that they had an existing contract with the city; and that the charter to the new company was a law impairing its obligation. The court decreed in favor of the new company, and that decree being affirmed in the Supreme Court of the State, the old company brought the case here. The questions accordingly were:

1. Whether there existed any contract between the city and the old company? *And if yea, then,*

2. Whether the statute incorporating the second company was a law impairing the obligation of a contract?

Of course, unless the first question was determined affirmatively, that is to say, unless it was determined that a *contract* had been entered into between the old company and the city, then the second could never arise.

*Messrs. McRae, Carlisle, and McPherson, for the old Company, plaintiffs in error:*

1. Under the act of 1860 the old company acquired corporate rights in the very matter of this controversy, to wit, the right of laying and operating street railways through certain streets of Memphis.

The advertisement for proposals by the board of mayor and aldermen on the 22d of November, 1859, the propositions of Kirk and Small and their associates offered on the 29th, their acceptance with the alterations in the resolution of that date by the board, and the after-acceptance by the associates, constituted a perfect and full agreement, a *congregatio mentium*, wherein the terms, stipulations, conditions, and obligations were decided and mutually adopted; and

from that moment became binding on all the parties, which a court of equity would require the specific performance of, notwithstanding the formal contract was to be reduced to writing and confirmed, and the bonds confirmed.[*]

And when the consent of the city was solicited and granted, by the resolution of 8th of December, that the associates should be incorporated for the security of the mutual rights, it was a substitution of the corporation to the benefit of the agreement, so that when the company was chartered and tendered its acceptance of the contract, the previous agreement not having been revoked, its rights became perfect.

The legislature did but incorporate, at the instance of both parties, certain natural persons who had been acting under a company name into a legal entity, even their name being retained, for the more convenient assertion and protection of the rights of both parties in respect of the contract which had been entered into. In other words, it did but substitute, with the consent of both parties, the incorporated company—this plaintiff in error—for the unincorporated one, with which the city of Memphis had contracted.

To this the city had consented in advance. But if she had not, the case shows a subsequent consent, and a complete recognition of the incorporated company so created as standing in the place of the original unincorporated one with which the city had contracted. If, therefore, any renewed consent to the original contract was contemplated by the act of incorporation, that consent was given.

But it cannot be maintained that an act of incorporation, which was in effect applied for by both parties for the avowed and single purpose of making that contract more effectual, could have been intended by either of them, or by the legislature acting upon their joint solicitation, not only to unsettle that contract, but absolutely to annul it. Yet this is the construction which opposing counsel would seek to establish.

---

[*] Levering & Carncross *v.* The Mayor et al., 7 Humphreys, 553, 554, 555; Blight *v.* Ashley, 1 Peters Circuit Court, 15.

In addition, it is more than doubtful if any assent was required in regard to making those roads already contracted for.  The words of section four, which authorizes the company "to complete and execute all contracts and agreements entered into with the city of Memphis, for the use of the streets of said city, or building said railroad," point to a past transaction, begun, which is to be concluded; an agreement entered into already beforehand, which is to be executed.  This agreement was for the use of the streets of the city or building said *railroad;* that is, the definite, fixed *railroad* heretofore agreed about.  This agreement being already entered into, the parties "may alter or enlarge the terms of the same."  But this agreement, as is evident from the future words, did not include *all the streets* nor other *roads* to be run on the excluded streets not yet the subject of any agreement. So the section goes on to authorize that they "may operate street rail ROADS (*in the plural*) by animal power on *all the streets* of the city of Memphis, *with* the consent of the city" (not yet had, but to be obtained), for they "may *enter in* to all necessary contracts for the building and operating said *roads.*"

Section 5 shows still further this meaning.  The words are:  "Said company may extend *said road* or *roads* outside the corporate limits," &c.

The clear meaning of the legislature, then, was that the company should have the use of the streets to operate its *road* according to the terms of the agreement it had made with the city, under the consent it had already obtained; and with reference to all streets not included in that agreement it might operate railroads thereon by obtaining the city's consent, under contract to be entered into for that purpose.

2. The act of the legislature incorporating the Memphis City Railroad Company impairs the obligation of the contract of the People's Passenger Railroad Company.

[The learned counsel then argued fully this point, but the court deciding, as it will be seen that it does, that no contract was ever made, the argument has no pertinence, and is not reported.]

We need go into no argument on the question how far the municipal corporation, under its pretty broad powers, had a power to grant a franchise to a railroad company to use the streets. Such discussion would be unprofitable, because the board of mayor and aldermen not only made no effort to grant a franchise in the streets, but expressly, and by the consent of the contracting parties, limited themselves to regulating the terms and conditions on which the iron might be laid and the cars run, leaving the adventurers to secure their rights by obtaining a charter, the city only giving its consent to the incorporation to strengthen its application for a charter in the mutual interest. Without doubt the legislature could have chartered the company with a grant of the streets irrespective of this consent. And by consequence, it might bestow the grant in a charter, drawn conformably to this consent. In this point of view, the action of the city corporation would be regular, and the legislative action in conformity with it, would ratify and adopt it. The question of the confirmation of a void estate does not arise in the case. The act of the legislature is to be interpreted according to the intention appearing upon its face, and if the intention appear to be, to make valid a void thing, it is within the paramount authority of the legislature if no constitutional restriction interpose.

Even if the act of the board went further and undertook to grant the franchise, it would amount to no more than such an irregularity as the after-ratification by the legislature rendered valid.

But the whole discussion is irrelative.

*Messrs. Wilson, Pike, and Johnson, contra.*

Mr. Justice CLIFFORD delivered the opinion of the court.

Express authority was vested in the Memphis City Railroad Company, by the fourth section of their act of incorporation, to "construct, maintain, use, and operate street railways by animal power, on all or any of the streets in the city of Memphis, using for that purpose all necessary ma-

chinery and equipments," and "to make, complete, and execute all contracts and agreements" made with the city or other parties for any purpose connected directly or indirectly with the construction, maintaining, or operating such railway, and to alter or enlarge the terms of the same with the said parties.\*

Evidently the legislature assumed to confer the franchise of the company without regard to the consent or action of the city, and upon the assumption that there was no valid subsisting contract between any other parties and the city for constructing the described railroad and putting the same in operation. Confirmation of that proposition, if anything else is needed, is found in the ninth section of the act of incorporation, which provides that the act entitled an act to incorporate the People's Passenger Railway Company of the City of Memphis, passed February 1, 1860, be and the same is hereby repealed.

Pursuant to the act of incorporation the company was duly organized, and the stock necessary to construct ten miles of the railway track, and to equip, run, and maintain the same, was duly subscribed, and the contract awarded to responsible persons to construct and equip that part of the railway as authorized by the terms of the charter.

Regularly organized and ready and willing to comply with all the requirements of their charter, the corporation complainants allege that their contractor, employees, and agents commenced to construct the railroad with the intention of fulfilling all their obligations, and would have completed the undertaking if they had not been interrupted and obstructed in the work; that the mayor and aldermen of the city, or some of them, in disregard of the franchise of the company, forcibly and with violence caused the work to be discontinued and stopped.

Based upon these and similar allegations the prayer of the bill of complaint is that John Park, mayor, and the board of mayor and aldermen, may be made parties respondents

---

\* Sessions Laws, 1865, p. 88.

in the suit, and for an injunction. They were accordingly made parties, and the complainants having executed a bond, with the usual conditions, in the sum of twenty thousand dollars, the writ of injunction was duly issued.

Service of the writ of injunction having been made, the People's Passenger Railroad Company filed a petition in the case, representing that they were authorized by their charter, *with the consent of the city*, to execute all contracts made with the city or other parties, for the use of the streets of the city for operating street railroads thereon by animal power, and praying to be made a party respondent to the bill of complaint. Hearing was had on the petition, and it appearing that the petitioners were interested in the issue, it was ordered by the court that the prayer of the petition be granted.

Being the original respondents, the city authorities filed a separate answer, in which they admit that the complainants made the offer in writing, as required by their charter, to construct the railroad, and that they took possession of one or more of the streets of the city for that purpose; that they commenced the work and that the mayor of the city interrupted the work as alleged and caused it to be discontinued.

Extended answer was also filed by the other corporation respondents, in which they set up their act of incorporation granted February 1, 1860, and especially the fourth section thereof, which provides that they "shall have power to complete and execute all contracts and agreements entered into with the city of Memphis, or other parties, for the use of the streets of said city for building said railroad, and may alter or enlarge the terms of the same with said parties, and may operate street railroads by animal power on all the streets in the city of Memphis, *with the consent of said city*."

They also allege that the city authorities, prior thereto, invited bids for the construction of such railroad on certain streets in the city, including those mentioned in the bill of complaint; that on the twenty-ninth of November, 1859, the bids made for that object were reported to the mayor and aldermen, and that they awarded the contract to William

Kirk and H. D. Small, whose bid was made in their own behalf, and as agents of certain associates since constituted the People's Passenger Railroad Company of Memphis; that the said contractors and their associates were subsequently, with the consent of the city authorities, incorporated by the legislature of the State; and with the understanding that the conditions of the contract as made and accepted should not be changed; and the respondents aver that they are advised and insist that the consent of the city given as stated and subsequently ratified by the legislature, as by their charter appears, is a contract between the parties which no subsequent legislature can constitutionally alter or impair without their consent.

By virtue of those proceedings they claim that they are invested with a franchise which neither the city council, nor the legislature, nor any other party can constitutionlly invade; and that the ninth section of the complainants' charter, by which their act of incorporation was repealed, is null and void, because it was passed in contravention of that clause of the Constitution which forbids the States from passing any law impairing the obligation of contracts, and the respondents in conclusion submit to the court that the matters set forth in the answer call for the interposition of the court to protect their rights as though they were complainants asking relief in the premises, and they pray that the answer may stand as a cross-bill, and that the mayor and board of aldermen, as well as the complainants, may be required to answer the allegations, and that the injunction may be dissolved.

Complainants demurred to the cross-bill, and the demurrer was sustained, and the cross-bill was dismissed. On appeal to the Supreme Court of the State the decree was affirmed, and the respondents in the original bill of complaint appealed to this court.

Two things must clearly appear in order to justify the court in adopting the views of the respondents: (1.) That there was a contract between the respondents and the city

authorities, which was complete in itself, and which was binding on both parties. (2.) That the charter subsequently granted to the Memphis City Railroad Company impairs the obligation of that contract.

I. Prior in date as the charter of the respondents is, it is clear that the charter granted to the complainants invades the rights of the respondents, if the exclusive rights which they claim were ever perfected by a binding contract made between them and the city authorities, unless it be assumed that the charter under which they claim such exclusive right could be repealed by a subsequent legislature. Viewed in that light the case presents two questions for decision, both of which must be decided in favor of the respondents, or the decree of the Supreme Court of the State must be affirmed: (1.) Whether the city authorities ever entered into a binding contract with the respondents that the respondents might complete and execute all contracts and agreements previously made with the city, or other parties, for the use of the streets of the city for building and operating said railroad; and if they did make such a contract, then (2), whether the act of the legislature repealing their act of incorporation is or is not a valid law.

Apparently, it was a question in the State court whether the respondents were ever legally incorporated; but there does not appear to be any substantial ground of doubt upon that subject, as the persons named in the act, and their associates, are expressly constituted a body politic and corporate under the name therein set forth, and the first section also provides that they may have succession for the term of twenty-five years, may sue and be sued, plead and be impleaded, may have and use a common seal, purchase and hold real and personal estate, create stock, elect directors and other officers, and may make all necessary by-laws, subject to the usual condition that they shall not be inconsistent with the laws of the State. Unfounded as the objection is in any view of the case, it may be dismissed without further consideration.

II. Apart from that topic, however, the real question is,

whether the special powers described in the fourth section of their charter ever actually vested in the respondents, as they allege in their answer. They insist that the exclusive right to construct railroads for the transportation of passengers over the streets of that city, and to use the streets of the city for that purpose, was granted by the city authorities to certain individuals as contractors before the respondents were incorporated, and that they, the respondents, with the consent of the city, subsequently became the assignees of that contract and agreement, and as such were and are invested with the authority to complete and execute that contract and agreement as ratified and confirmed by the legislature.

None of the elements of that proposition are admitted by the complainants; but they insist that municipal corporations have no power to grant such a franchise to individuals or other corporations, unless thereto specially authorized by the legislature; and they also insist that no such power is shown to have been conferred in this case.

III. Serious doubts are entertained whether the mayor and aldermen of the city of Memphis possessed any authority to make such a contract as that set up in the answer as having been made by them with the persons under whom the respondents claim, as it obviously amounts to a franchise for twenty-five years; and if so, then it is clear that it could not be granted by those authorities in virtue of the ordinary powers possessed by such municipalities.

Power to make laws is vested in the legislature, under the constitution of the State, and it is very doubtful whether the legislative department can delegate to any other body or authority the power to grant such a franchise, as the exercise of that power involves a high trust created and conferred for the benefit of those who granted it, and as the trust is confided to the legislature it must remain where it is vested until the constitution of the State is changed.*

* Cooley on Constitutional Limitations, 117; Thorne v. Cramer, 15 Barbour, 112; Barto v. Himrod, 8 New York, 483; Parker v. Commonwealth, 6 Pennsylvania State, 507; Sedgwick on the Constitution, 165; Wayman v. Southard, 10 Wheaton, 46.

Franchises, it is conceded, cannot, as a general rule, be granted by such a corporation, and it is clear that the privilege of making a railway or turnpike, or establishing a ferry and taking tolls for the use of the same, is a franchise, as the public have an interest in the same, and the owners of the privilege are liable to answer in damages if they refuse the use of the same, without any reasonable excuse, upon being paid or tendered the usual fare.*

IV. Consonant with that view this court held, in the case of the *Bank of Augusta* v. *Earle,*† that franchises are special privileges conferred by the government on individuals, and which do not belong to the citizens of the country generally of common right; and that in this country no franchise can be held which is not derived from the law of the State.‡

Contracts undoubtedly may be made by such municipalities to the extent of the authority conferred for that purpose by the legislature, but the granting of a franchise is not the same thing as a contract, and the exercise of such a power cannot be upheld or vindicated as falling within the same rule as the power to make contracts.

By the amendment to their charter, passed February 13th, 1854, the authorities of the city were empowered to regulate the laying of railroad iron and the passage of railroad cars through the city; but the better opinion is, that the provision in that behalf relates to the construction of railroad tracks and the running of railroad cars through the city by incorporated companies whose cars are propelled by steam, and that it has no reference whatever to the construction or authorization of a street passenger railway within the corporate limits, as claimed by the respondents in their answer.§

Authority is also conferred on municipal corporations, by the code of that State, "to grant privileges in the use and

---

* 3 Kent (11th ed.), 590; Willoughby *v.* Horridge, 16 English Law and Equity, 437; Beekman *v.* Railroad Company, 3 Paige Ch. 45.

† 13 Peters, 595.

‡ Angell & Ames on Corporations (8th ed.), 2; State *v.* Armstrong, 3 Sneed, 634; Mayor, &c. *v.* Shelton, 1 Head, 24.

§ Sessions Laws, 1854, p. 294; Moses *v.* Railroad Company, 2 Illinois, 522.

enjoyment of the streets" of the municipality; but it would be a very forced construction to hold that the power to grant such a franchise for twenty-five years is included in that provision.*

V. Independently of those provisions, it is quite clear that the municipal authorities of the city possessed no such power as is supposed by the respondents. Such corporations are usually invested with the power to lay out, open, alter, repair, and amend streets within the corporate limits; but the rule is well settled, that by virtue of those powers, without more, they cannot grant to an association of persons the right to construct and maintain for a term of years a railway in one of the streets of the municipality for the transportation of passengers for private gain, and that an ordinance or resolution of the authorities granting such a right is void.†

Special powers are given to such corporations to lay out, open, and repair streets as a trust to be held and exercised for the benefit of the public, from time to time, as occasion may require, and the general rule is, that those powers cannot be delegated to others, nor be effectually abridged by any act of the municipal corporation without the express authority of the legislature.‡

Municipal corporations are doubtless invested with subordinate legislative powers to be exercised in the passage of ordinances for local purposes, connected with the public good, but they are merely derivative, and are subject, at all times, to the legislative control.§

VI. Suppose, however, the authority to make the contract set up in the answer of the respondents may be derived from the statutory provisions to which reference is made, still the

---

* Code, 1858, p. 303.

† Davis et al. *v.* The Mayor, 14 New York, 514.

‡ Milhau *v.* Sharp, 27 New York, 611; People *v.* Kerr, 27 Ib. 188; Elliott *v.* F. and W. Railroad, 32 Connecticut, 579; Wager *v.* Troy Union Railroad, 25 New York, 526; People *v.* Third Avenue Railroad, 45 Barbour, 63; Street Railway *v.* Cummingsville, 14 Ohio, New Series, 523; State *v.* Council of Hoboken, 1 Vroom, 225.

§ 2 Kent, 11th ed., 317; Rogers *v.* Burlington, 3 Wallace, 663.

court is of the opinion that the decree of the State court should be affirmed upon two grounds, which will be separately and briefly explained: (1.) Because the supposed contract with the persons under whom the respondents claim was never perfected between those persons and the city authorities. (2.) Because the respondents fail to show, even if it be admitted that the contract between those parties was perfected, that the city authorities ever consented to accept the respondents as the successors of the supposed prior contracting party.

1. Examined carefully, the evidence will show that at every stage of the negotiations something remained to be done to complete the contemplated arrangement.

Prior to the twenty-second of November, 1859, the proper authorities of the city passed an ordinance proposing to grant the right to construct and operate street railroads for the transportation of passengers in cars to be drawn by horses or mules, for twenty-five years from the passage of the ordinance. Bids were subsequently invited for that purpose, and the persons before named submitted four propositions as bids for the contract. On the twenty-ninth of the same month the city council authorized the mayor and corporation attorney to close a contract with those persons to construct such a railway on certain streets and on certain prescribed terms—they to pay to the city the sum of one hundred and twenty-seven thousand five hundred dollars, at the times and on the terms named in their second proposition. But the city authorities reserved the right to determine what description of rails and weight of iron should be used by the contractors, and the stipulation was that they should give a bond to the city in the sum of twenty-five thousand dollars to indemnify the city and individuals against damage. Subsequent proceedings intervened before any further action was taken under that resolution.

Kirk and Small, professing to act in behalf of the association called the People's Passenger Railroad Company of Memphis, December 2, 1859, addressed a letter to the mayor and aldermen of the city accepting the grant of the streets

named as set forth in the " general railroad ordinance " and in the aforesaid .resolution, subject to the terms, conditions, privileges, and restrictions of said ordinance and resolution, and expressing their readiness to sign a contract embodying those terms and conditions.

Permission was given by the city authorities to those persons, on the eighth of the same month, to procure for themselves an act of incorporation, provided it did not change the conditions of their proposition, and was granted subject to the consent of the city, and was so framed as not to prevent any other company from building street railroads. They were accordingly incorporated February 11, 1860, and the act of incorporation provides, as before explained, that the respondents, " with the consent of said city," may exercise the powers described in the fourth section of the charter. No contract was ever executed between the persons before named and the city authorities, and no further efforts were made to complete the proposed arrangement until after the act of incorporation was passed.

Granted and accepted, as the charter was, on the condition that the respondents should secure the consent of the city before they could exercise the franchise in question, they are not at liberty to set up any other theory. Conclusive proof that the original arrangement was not concluded is exhibited in the letter of the president and secretary of the respondent corporation, written after the respondents were organized, and addressed to the board of mayor and aldermen, in which they refer to a contract as one prepared by the corporation attorney, and say that they are authorized to sign the contract on the part of the corporation. They say they are prepared to give the required bonds as soon as the contract is executed, but they do not pretend that any draft of a contract was ever before presented to the city authorities.

Nothing of the kind is suggested in the communication, but they speak of the contract as one prepared "for our signature," and the bid as " our bid," assuming throughout that the persons who made the bid and conducted the nego-

tiations and the corporation respondents are identical, which is a fatal mistake. They are not the same, and it is clear that the proposed contract between those who made the bid and the city was never completed.*

2. Attempt is made by the respondents to give a restricted construction to the phrase "with the consent of the said city," as contained in the fourth section of their charter, but the court is not able to concur in that suggestion. Briefly stated, the suggestion is that the phrase, as properly construed, only requires that the consent of the city should be obtained in case the company should desire to construct railways on streets other than those designated in the contract, but it is not possible to adopt that construction of the phrase. On the contrary it seems clear that the franchise described in the fourth section was granted subject to the condition precedent, that the respondents should obtain the consent of the city to use the streets for the purpose therein described.† Granted on that condition the charter would not avail the respondents in this case even if it appeared that the consent to that effect had been given to the two persons who made the bid and conducted the negotiations antecedent to the act of incorporation.‡

Consent to those individuals, even if given as supposed, did not bind the city to accept an incorporated company in their stead, as the legislature might, for good reasons, require that such consent should be again given after the franchise was granted; and as such consent was never obtained, it is quite clear that the decree of the State court must be affirmed. Influenced by that view of the case, the court does not think it necessary to refer to the subsequent proceedings between the parties, as it is clear that none of them are of a character to give any different aspect to the controversy.

DECREE AFFIRMED.

---

* Governor v. Petch, 10 Hurlstone & Gordon, 610; Musser v. Street Railway Co., 7 American Law Register, 284.

† Walker v. Devereaux, 4 Paige Ch., 251.

‡ King v. Mayor, 3 Barnewall & Adolphus, 271; King v. Justices, 1 Neville & Manning, 67.

The CHIEF JUSTICE, with NELSON and DAVIS, JJ., dissented, Mr. Justice DAVIS saying for himself and them, that they thought that there was a contract between the People's Passenger Railway Company and the City of Memphis which could not be impaired by State legislation, but that he did not go into the question at length, as it was of no general interest, and of importance only to the parties to the suit.

Justices STRONG and BRADLEY had not taken their seats on the Bench when this case was adjudged.