GOVIN et al. v. CITY OF CHICAGO et al. (two cases).

(Circuit Court, N. D. Illinois, N. D.   May 28, 1904.)

**1. STREET RAILROADS—FRANCHISES—CONSTRUCTION—LIMITATIONS.**

Since prior to the enactment of Act April 10, 1872 (Laws 1871–72, p. 229, art. 5, § 1, subd. 24), giving cities organized thereunder power to permit, regulate, and prohibit the operation of street railroads within their limits, such cities had no such power, the act of 1859 (Laws 1859, pp. 530–532), as amended by the acts of 1861 (Laws 1861, p. 340) and 1865 (Laws 1865, p. 597), incorporating the Chicago city railways and providing that such corporations were authorized and empowered to construct, maintain, and operate railways, etc., in the city of Chicago and over and along such street or streets, etc., within the present or future limits of the south and west divisions of the city, as the city council should authorize. constituted a grant to the companies named directly over the streets designated or to be designated, to the extent that the franchise granted was essential to the promotion of street railway facilities, and was not a mere grant to the city to in turn grant a franchise to the railways.

**2. SAME—TERM OF GRANT.**

The act of 1859 (Laws 1859, pp. 530–532), as amended by the acts of 1861 (Laws 1861, p. 340) and 1865 (Laws 1865, p. 597), incorporating the Chicago city railways, and granting necessary rights in the streets selected and thereafter to be selected, provided that the railways should be constructed, maintained, and operated in such manner, and on such terms and conditions, and with such rights and privileges as the common council has, or by contract with the parties may, prescribe. *Held*, that such provision did not confer on the common council of the city power to determine the life of the grant as to the use of the streets selected and to be selected, as well as the manner of the exercise of the railway companies' powers, but that the grant extended for the life of the corporation.

**3. SAME—CONTRACTS—CONSTRUCTION.**

Const. 1870, art. 2, § 14, provides that the Legislature shall pass no law making any irrevocable grant of special privileges or immunities. Article 11, § 1, prohibits the further creation of corporations by special laws, and article 4, § 22, prohibits any grant by special law of a right to lay down railroad tracks. Article 11, § 4, declares that the General Assembly shall not grant the right to construct any street railway within any city, town, or incorporated village without requiring the consent of the local authorities having control of the streets, etc. By Act April 10, 1872 (Laws 1871–72, p. 229, art. 5, § 1, subd. 24), the city councils of cities organized under such act were empowered to permit, regulate, and prohibit the locating, construction, or laying of any horse railroad in any street or public place, which permission was limited to a period not exceeding 20 years. *Held*, that the act of 1859 (Laws 1859, pp. 530–532), as amended by the acts of 1861 (Laws 1861, p. 340) and 1865 (Laws 1865, p. 597), incorporating the Chicago city railways, and granting to such corporations rights in such streets, bridges, and rivers within the present and future limits of the south and west divisions of the city of Chicago as the common council of the city should authorize, etc., did not constitute a grant in præsenti by the Legislature of streets designated by the city after it exercised its election to adopt and be governed by the provisions of the act on April 23, 1875, as to which streets the railway companies' rights were regulated by the city ordinances affecting the same.

**4. SAME—STATUTES—AMENDMENTS—EFFECT.**

Act Feb. 19, 1859 (Laws 1859, p. 530) § 1, created certain persons a corporation under the name of the Chicago City Railway Company, and gave them certain powers, thereafter enumerated, for 25 years, with rights to operate a street railway in the south and west divisions of the city of Chicago; and section 10 (page 531) of the same act provided that all the powers and privileges granted to such persons were conferred on certain

other persons by the name of the North Chicago City Railway Company for the north division, etc. Thereafter, by Act Feb. 21, 1861 (Laws 1861, p. 340), the first and second sections of the former act were amended so that the provision for the life of the corporation was extended for 99 years. *Held*, that such amendment was not limited to the rights of the Chicago City Railway Company, but applied as well to the rights conferred by the act of 1859 on the North Chicago Railway Company.

**5. SAME—MUNICIPAL CORPORATIONS—CHARTERS—TIME OF TAKING EFFECT.**

Act April 10, 1872 (Laws 1871–72, p. 218), providing a general city and village charter to be applicable to cities voting to be governed thereby, became applicable to the city of Chicago on the date the vote in favor of accepting the same was counted and declared, and not on the date the vote was taken.

## In Equity.   On bill for injunction.

The city of Chicago is divided by the Chicago river and its branches, into three natural divisions, known as the south, the west and the north divisions.

February 19, 1859, the general assembly of the State of Illinois passed "An Act to promote the construction of horse railways in the city of Chicago" (Laws 1859, pp. 530–532), providing as follows:.

Section 1. Be it enacted by the People of the State of Illinois represented in the General Assembly: That Franklin Parmalee, Liberty Bigelow, Henry Fuller and David A. Gage and their successors be and they are hereby created and constituted a body corporate and politic by the name of the Chicago City Railway Company for the term of twenty-five years, with all the powers and authority incident to corporations for the purposes hereinafter mentioned.

Sec. 2. The said corporation is hereby authorized and empowered to construct, maintain and operate a single or double track railway with all necessary and convenient tracks for turnouts, side tracks and appendages in the city of Chicago and in, on, over and along such street or streets, highway or highways, bridge or bridges, river or rivers, within the present or future limits of the south or west divisions of the city of Chicago as the common council of said city have authorized said corporators or any of them, or shall authorize said corporation so to do in such manner and upon such terms and condition, and with such rights and privileges as the said common council has or may by contract with said parties or any or either of them prescribe, but said corporation shall not be liable for the loss of any baggage carried on said railway kept in and under the care of its owner, his servant or agent.

Sec. 3. The capital stock of said corporation shall be $100,000, and may be increased from time to time at the pleasure of said corporation. It shall be divided into shares of $100 each and be issued and transferred in such manner and upon such conditions as the board of directors of said corporation may direct.

Sec. 4. All the corporate powers of said corporation shall be vested in and exercised by a board of directors and such officers and agents as said board shall appoint. The first board of directors shall consist of said Franklin Parmalee, Liberty Bigelow, Henry Fuller and David A. Gage, and thereafter of not less than three nor more than seven stockholders, at such time and in such manner as the said corporation shall by its laws prescribe. The said directors shall hold their offices until their successors are elected and qualified; and may fill any vacancies which may happen in the board of directors by death, resignation or otherwise. They may also adopt such by-laws, rules and regulations for the government of said corporation and the management of its affairs and business as they may think proper, not inconsistent with the laws of this state.

Sec. 5. The said corporation is hereby authorized to extend the said several railways herein authorized to be built in the manner aforesaid to any point or points within the county of Cook in this state; and to enable said corporation to construct any or all of the railways herein authorized or their appendages, the said corporation is hereby vested with power to take and apply private property for the purposes and in the manner prescribed by an act entitled "An act to amend the law condemning right of way for purposes of internal

132 F.—54

improvement," approved June 22, 1852, and the several acts amendatory thereof, and may exercise all the powers conferred upon railroad corporations by the twenty-fifth and twenty-sixth sections of "An act to provide for a general system of railroad incorporations," approved November 5, 1849, ascertaining and making recompense for all damages sustained, agreeably to the provisions of the act hereinbefore first mentioned.

Sec. 6. The said corporation is hereby authorized with the assent of the supervisor of any township to lay down and maintain its said railway or railways in, upon, over and along any common highway in said township, but in such manner as not to obstruct the common travel of the public over the same. In all cases where vehicles shall meet the cars or carriages of said railway, either in the city or county, said vehicles shall give way to the cars or carriages on the railway.

Sec. 7. All of the rights and privileges granted or intended so to be to said Franklin Parmalee, Liberty Bigelow, Henry Fuller and their associates in and by the ordinances of the common council and the amendments thereto, are hereby in all things affirmed and shall pass to and become vested in the corporation hereby created.

Sec. 8. Nothing herein contained shall authorize the construction of more than a single track with the necessary turnouts, which shall only be at street crossings upon State street between Madison and Twelfth streets, except by the consent of the owners of two-thirds of the property in lineal measurement lying upon said State street between Madison and Twelfth streets aforesaid. Nor shall anything herein contained be construed to authorize the company hereby incorporated to permit the cars of any other railroad company whatever, propelled by steam, to be run along or upon the railway of the company hereby incorporated.

Sec. 9. The said company hereby incorporated shall within two years from the passage of this act erect, maintain and operate two railways, one from Lake street to the southern boundary of the city, and one from the south branch of the Chicago river on Madison street to the western boundary of said city, and upon failure to do so this act and all the privileges and franchises hereby conferred shall cease and determine.

Sec. 10. All the grants, powers, privileges, immunities and franchises conferred upon, and all duties and obligations required of Franklin Parmalee, Liberty Bigelow, Henry Fuller and David A. Gage by this act for the south and west divisions of the city of Chicago and the county of Cook, are hereby conferred upon and required of William B. Ogden, John B. Turner, Chas. V. Dyer, James H. Rees and Voluntine C. Turner by the name of the North Chicago City Railway Company for the north division of said city, and said county of Cook, as fully and effectually to all intents and purposes as if they had been by a separate act incorporated with all of said grants, powers, privileges, immunities and franchises, conferred upon them, and all of said duties and obligations imposed upon them, and the said last named corporation may take, hold, mortgage and convey real estate.

February 21, 1861, the general assembly passed another act (Laws 1861, p. 340) constituting certain persons therein named a body corporate by the name of the Chicago West Division Railway Company, for the term of twenty-five years, and providing that such corporation should possess all the powers conferred by, and be subject to all the provisions contained in, the second, third, fifth and sixth sections of the foregoing act of February 14, 1859.

February 6, 1865, the general assembly of the state passed another act (Laws 1865, p. 597), the first and second sections of which follow.

Section 1. Be it enacted by the People of the State of Illinois, represented in the General Assembly, That the first section of an act of said general assembly, entitled "An act to promote the construction of horse railways in the city of Chicago," approved February 14, 1859, and the first section of a certain other act of said general assembly, entitled "An act to authorize the extension of horse railways in the city of Chicago," approved February 21, 1861, be, and the same are hereby so amended as that all the words in said respective sections after the word "Company" therein, respectively, shall be and read as follows, viz.: For ninety-nine years, with all the powers and authority hereinafter expressed, or pertaining to corporations for the purposes hereafter mentioned.

Sec. 2. That the second section of the act first above referred to by its title, and which section is included in and made a part of the act secondly above referred to by the title thereof, be and the same is hereby, as to both of said acts, so amended as to read as follows, viz.: The said corporation is hereby authorized and empowered to construct, maintain and operate, a single or double track railway, with all necessary and convenient tracks for turnouts, sidetracks and appendages, in the city of Chicago, and in, on, over and along such street or streets, highway or highways, bridge or bridges, river or rivers, within the present or future limits of the south and west divisions of the city of Chicago, as the common council of said city have authorized said corporators or any of them, or shall from time to time authorize said corporations, or either of them, so to do, in such manner, and upon such terms and conditions, and with such rights and privileges, immunities and exemptions, as the said common council has, or may, by contract with said parties, or any or either of them, prescribe; and any and all acts or deeds of transfer of rights, privileges or franchises, between the corporations in said several acts named, or any two of them, and all contracts, stipulations, licenses and undertakings, made, entered into or given, and as made or amended by and between the said common council and any one or more of the said corporations, respecting the location, use or exclusion of railways in or upon the streets, or any of them, of said city, shall be deemed and held and continued in force during the life hereof, as valid and effectual, to all intents and purposes, as if made a part, and the same are hereby made a part of said several acts.

Prior to these acts—August 16, 1858—the common council had passed an ordinance giving permission, authority and consent to Franklin Parmalee and others to lay down, and operate a single or double track for street railway purposes in, and upon certain streets in the south division, and a certain street from the south division into and through the west division to the city limits, for the full time of twenty-five years from the passage thereof, and thereafter, until the city should purchase the tracks, cars and other property used in the construction and operation of the railways. The ordinance provided among other things, that the tracks should be operated with animal power only; should be used solely to transport passengers; should not be elevated above the streets; rates of fare; provisions for grading, and the like.

Pursuant to the act of 1859, the city council, May 23, 1859, gave consent, permission and authority to the Chicago City Railway Company to lay tracks on other streets in the ordinances mentioned, and providing as in the ordinance of 1858, the character of power to be used, rates of fare, character of track, and the like.

On the same day a like ordinance was passed, giving consent, authority and permission to the North Chicago City Railway Company, and providing that the rights and privileges thus granted should continue for the full term of twenty-five years and no longer. Further ordinances were granted, both to the North and West Side companies from this on to 1875, when the city of Chicago passed from government under its special charter, to government under the city and village act of 1872. Laws 1871–72, p. 218.

All of these ordinances gave the consent, authority and permission of the city to the laying and operation of tracks; and made provision for the manner of laying tracks, the power to be used, fares to be charged, and the like. The ordinances contained time limits as follows:

For the West Side:

Ordinance of November 18, 1861, to C. City Ry. Co.

No provision as to time limit.

Ordinances of March 14, 1864, and March 28, 1864.

(Halsted street.)

No express provision as to time limit; "subject to the conditions of the ordinances heretofore passed concerning said railway company (C. W. Div.), or the C. C. Ry. Co."

Ordinances of March 28, 1864, and July 11, 1864.

(Clinton street.)

No express provision as to time limit; subject to regulations and conditions concerning other railway tracks.

Ordinance of August 17, 1864.

No express provisions as to time limit; subject to ordinances in force respecting railways in the south and west divisions.

Ordinance of November 13, 1871.

No express provisions as to time limit, but all contracts applicable to the line on Van Buren street, east of Ogden avenue (Ord. May 23, 1859), are extended to line authorized.

Ordinance of March 8, 1875, and amended April 19, 1875.

Until October 1, A. D. 1894, and thereafter until purchase by the city and payment of appraised value.

For the North Side:

Ordinance of January 18, 1864.

No express provision as to time limit, but subject to all the rules, limitations and restrictions prescribed in ordinance of May 23, 1859.

Ordinance of August 11, 1864.

No express provision as to limit of time, but subject to all restrictions and conditions, rights and privileges mentioned in ordinance of May 23, 1859.

Ordinance of May 8, 1871, and resolutions of company and city as to acceptance.

No express provision as to limit of time; subject to all the restrictions and conditions, rights and privileges mentioned in ordinance of May 23, 1859; all contracts between city and company applicable to N. Clark street line extended to Center street and Lincoln avenue line. (See also resolutions of company and city relating to acceptance.)

Ordinance of November 20, 1871.

No express provision as to time limit, but subject to all the rules, limitations and restrictions prescribed in ordinance of May 23, 1859. Act of February 6, 1865, referred to, and declaration made that extension of time thereby granted is not ratified.

Ordinances of October 26, 1874, and April 26, 1875.

Until October 1, 1894, and thereafter until purchase of railway, its equipment and appurtenances by the city, and payment of appraised value thereof.

The ordinance of April 26, 1875, covering Wells street, is included herein.

The Illinois Constitution of 1870 provided that thereafter no corporation should be created by special laws or its charter extended, changed or amended, except those for charitable, educational, penal, or reformatory purposes, but that the general assembly should provide by general laws, for the organization of all corporations thereafter to be created. Article 11, § 1.

Also, that no law should be passed by the general assembly granting the right to construct and operate a street railroad within any city, town or incorporated village, without requiring the consent of the local authorities having the control of the street or highway proposed to be occupied by such railroad. Article 11, § 4.

Also, that the general assembly should pass no law granting to any corporation the right to lay down railroad tracks, or amending existing charters, or grant to any corporation any special or exclusive privilege, immunity or franchise whatever. Article 4, § 22.

Also, that there should be passed no law making any irrevocable grant of special privileges or immunities. Article 2, § 14.

April 10, 1872, the general assembly passed a general city and village act in which it was provided that the councils of cities organized under that act, should have power "to permit, regulate or prohibit the locating, constructing or laying a track of any horse railroad in any street, alley or public place; but such permission shall not be for a longer time than twenty years." Laws 1871–72, p. 229, art. 5, § 1, subd. 24. From time to time since 1875, the council has passed ordinances, granting permission and authority to construct, maintain and operate tracks, and extensions of tracks, to the North and West Side Companies; fixing the limits of the life of such ordinances, some for twenty years from passage, and others for a term not exceeding twenty years and thereafter until purchase.

Ordinances of outlying towns not then within the limits of the incorporated city, were likewise passed, granting to the North and West Side Companies,

authority to construct and operate railways beyond the limits of the city, in most cases without reference to the time limits.

In 1883 differences arose between the city and the street railway companies, respecting the nature and extent of the legal and contractual rights of the parties, and particularly as to whether the act of 1865 gave to the railway corporations the right to maintain and operate their lines to the end of the ninety-nine year period. The differences were not settled, but were passed over by a license for twenty years in the words following:

"Sec. 5. (As amended by ordinance of August 8, 1883.) In consideration of the acceptance by said companies of this ordinance and the several covenants and undertakings herein mentioned, on behalf of the several city railway companies mentioned herein, and the execution of said bonds, the times named for the operation of the railways now used or operated by either of said railway companies in the ordinances heretofore passed, granting permission and authority to construct, maintain and operate street railways in the streets of said city, are hereby extended twenty years from the passage hereof, but nothing in this section contained, or the acceptance hereof, shall in any manner impair, change or alter the existing rights, duties and obligations of the city, or of said companies, respectively, from and after the expiration of the said term of years hereinbefore mentioned."

The bill is for an injunction to restrain the city, and its officers, from in any way interfering with the possession and enjoyment of the grants claimed by the companies, under the acts of 1859, 1861, and 1865.

The further facts are stated in the opinion of the court.

W. W. Gurley (John S. Miller, Wm. G. Beale, Henry Crawford, Joseph S. Auerbach, and Brainard Tolles, of counsel), for complainants.

Edgar Bronson Tolman, Corp. Counsel (David T. Watson, Edwin Burritt Smith, and John C. Mathis, of counsel), for defendant City of Chicago.

Before GROSSCUP and JENKINS, Circuit Judges.

GROSSCUP, Circuit Judge, delivered the opinion of the court.

There are urgent practical reasons for a prompt decision of this case, in consideration of which we will state the conclusions to which we have come, omitting any elaboration of the reasons upon which our conclusions are based.

The case turns chiefly on the interpretation to be put on the act of 1859, as amended in 1861 and 1865. Section 2 of these acts falls, reasonably and naturally, into the following divisions:

The Granting Part:

"The said corporation is hereby authorized and empowered to construct, maintain and operate a single or double track railway with all necessary and convenient tracks for turnouts, side tracks and appendages in the city of Chicago, and in, on, over and along such street or streets, highway or highways, bridge or bridges, river or rivers, within the present or future limits of the south and west divisions of the city of Chicago."

The Identifying Part:

"As the common council of said city have authorized said corporators, or any of them, or shall from time to time authorize said corporations or either of them so to do;" and

The Part Relating to Manner, Terms and Conditions:

"In such manner, and upon such terms and conditions and with such rights and privileges, immunities and exemptions as the said common council has, or may by contract with said parties or either of them, prescribe."

In giving expression to the will of the legislature, each of these parts perform a distinct purpose and office; and each must be interpreted—not as private interest might desire, nor as public interest after the lapse of years might desire—but as the legislature, at the time, intended. The clear legislative intent controls.

The initial question, then, is this: Did the legislature, in the granting part of this section, intend to vest the street railway companies named, with a right to construct, maintain and operate street railways in the streets designated, or to be thereafter designated? Is the right thus granted derived directly from the legislature, not by circumlocution, but out of its own powers over the subject-matter? Or, was it intended by the legislature that the companies named should be vested by this section with corporate capacity only to take grants, the power to make such grants being delegated to the city?

In answering these inquiries, as in the interpretation of all statutes that come to us from a considerable past, we must look, not only to the language actually used, but to the historical relation out of which the language comes, as also to the interpretation put upon like language by courts speaking at, or about, that period.

Street railways came into use about the year 1850, being twenty years later in origin than steam roads. In New York one of the first street railroads was the outgrowth of an omnibus line, and differed from it only in the fact that it was confined to a track. So little did street railways figure, at that time, in the general activities of the country that no legislative authority was in existence for so much as their incorporation. Cook on Corporations, vol. 3, par. 912.

At first it was thought that under their general power over streets, the municipalities in whose streets street railways were to be laid, might have power to authorize the construction and operation of such roads. But this view was quickly dissipated by the courts. With unanimity, the courts decided that the legislatures of the states, alone, possessed such power; that the municipality had no such power; and that the power could be exercised by the legislature without the consent of the municipality, or even a reference to its wishes. State v. Mayor of New York, etc. (1854) 3 Duer, 119; Chicago v. Evans (1860) 24 Ill. 52; People's R. Co. v. Memphis R. Co. (1860) 10 Wall. 38, 19 L. Ed. 844. In the latter case the Supreme Court of the United States said:

"Such corporations" (referring to municipalities) "are usually invested with the power to lay out, open, alter, repair and amend streets within the corporate limits; but the rule is well settled that by virtue of those powers, without more, they can not grant to an association of persons, the right to construct and maintain, for a term of years, a railway in one of the streets of the municipality for the transportation of passengers for private gain. * * * Municipal corporations are doubtless invested with subordinate legislative powers to be exercised in the passage of ordinances for local purposes, connected with the public good, but they are merely derivative and are subject at all times to the legislative control."

In general, the court held that the municipality had no power, in virtue of the ordinary powers possessed by such municipality, to grant a franchise to a street railway company to use its streets; and even doubted whether such power could be constitutionally delegated by the legislature to the municipality. These and other cases show the ideas of

public policy then held, relative to the sources from which street railway companies obtained their rights to use the streets for railway purposes.

The language used in the section under consideration, must be read in view of this, the then prevailing idea respecting railway grants. Thus viewed, it constituted a clear and definite grant of authority to the companies to occupy the streets—a grant direct, and not by circumlocution; a grant by the legislature to the companies, not the grant of power to the city to grant in turn to the companies.

True, the streets to be used are not set out by name; but they are set out by description, a description that fixes with certainty their identity as to the then past, and with equal certainty the means of identity as to the then future; and it is a universal maxim in law, that that is certain that can be made certain. True, also, that the grant is in the nature of a float, not attaching to any specific street until such street has been designated; but when the street has been designated, the grant attaches as of the date of the act. In that sense, the grant is in præsenti. U. S. v. Southern Pac. R. Co., 146 U. S. 593, 13 Sup. Ct. 152, 36 L. Ed. 1091; St. Paul & N. P. R. Co. v. Northern Pac. R. Co., 139 U. S. 5, 11 Sup. Ct. 389, 35 L. Ed. 77. We cannot escape the judgment that the legislature intended, in this section, to grant to the companies named, directly out of its own plenary power over the subject-matter, the streets designated, or to be designated, to the extent that the franchise granted was essential to the promotion of street railway facilities.

The decisions of other courts involving like questions, lead to the same result. Atlantic City Water Works v. Consumers' Water Co., 51 N. J. Law, 420, 17 Atl. 824; Galveston R. Co. v. Galveston, 90 Tex. 398, 39 S. W. 96, 36 L. R. A. 33; New Orleans Water Works Co. v. Louisiana Sugar Refining Co., 125 U. S. 18, 8 Sup. Ct. 741, 31 L. Ed. 607; Citizens' St. R. Co. v. City of Memphis (C. C.) 53 Fed. 715.

The next inquiry is this: What is the period, or time life, of this legislative grant? In the absence of controlling language to the contrary, the life of the grant is the period fixed for the life of the corporation. On this the decisions are unanimous. But it is urged upon us, that because under the acts of 1859, 1861 and 1865 the street railways are to be constructed, maintained and operated "in such manner, and upon such terms and conditions, and with such rights and privileges as the common council has, or by contract with the parties shall prescribe," the life of the grant, as well as the manner of its exercise, is distinctly put within the power and disposition of the common council.

Ordinarily, in the use of legal phraseology, the phrase "terms and conditions, rights and privileges" is not employed to convey power over, or relating to the time or period through which the tenure dealt with is intended to run; but conveys power over or relates to the means, the methods, and the incidents connected with the exercise of such tenure. Such plainly was meant to be the signification of the phrase as employed here. Hurd v. Whitsett, 4 Colo. 77; Chicago Terminal Ry. Co. v. Chicago, 203 Ill. 576, 68 N. E. 99. Had the legislature meant otherwise—had the legislature meant to put within the power and disposition of the common council the period of the grant as well as the manner of

its exercise—apt language was at hand to express such purpose. The absence of such language clearly implies, to our minds, the absence of the purpose.

Much is said in this connection of the significance of the words "by contract," employed in the clause under discussion. It is urged, as we understand the argument, that by the use of these words, the legislature indicated a legal modus through which the companies and the city should deal, which modus includes as well the period through which occupancy should run, as the manner of its exercise. The difficulty with the argument, however, as any reading of the section discloses, is, that the modus thus pointed out does not, in the construction of the sentences of the section, reach forward to the granting clause at all, but limits itself strictly to that portion of the section providing for the manner in which the grant shall be exercised. It could not, without violence to every rule of interpretation, be dragged forward, so as to apply to the essence of the grant, or even to the means of identifying the streets covered by the grant. Plainly, this provision of the section was intended as a feasible way in which the city and the companies might, for given periods, fix those stipulations that relate to the physical side of the occupancy of the streets, or the administrative side of the operation of the lines.

Nothing better illustrates the legislative purpose in that respect, and perhaps the wisdom of that purpose, than the vicissitudes through which the physical and administrative sides of street railways have since come. The motive power then was animal; since, it has been superseded by cable lines, and these in turn by electricity. Wood paving is giving way to granite and asphalt; the size of cars used is increasing; and there are many other like changes, illustrating that while the franchise itself might run for a long period, the regulation of the manner of its exercise should be left pliable to the changing needs of time and progress.

In any other view of the legislative intent than the one stated, the clause of section two that follows, would be without any reasonable meaning. That clause reads as follows:

"And any and all acts or deeds of transfer of rights, privileges or franchises, between the corporations in said several acts named, or any two of them, and all contracts, stipulations, licenses and undertakings, made, entered into or given, and as made or amended by and between the said common council and any one or more of the said corporations, respecting the location, use or exclusion of railways in or upon the streets, or any of them, of said city, shall be deemed and held and continued in force during the life hereof, as valid and effectual, to all intents and purposes, as if made a part, and the same are hereby made a part of said several acts."

This clause evidently was inserted in view of the fact that prior to 1865, but after 1859, three street railway companies had come into the field, the city for that purpose being divided between them into the north side, the west side and the south side, each of the three companies stipulating to operate only within its respective territory. In thus dividing the territory it had been found necessary to transfer from each company to one of the other companies, certain franchises, licenses and contracts. The purpose of the clause was to validate these transfers

during the life of the grant, or as the phrase runs, "during the life hereof."

The clause deals, it will be observed, with "franchises," with "licenses," and with "contracts." Each of these expresses a legal relationship distinct from that expressed by the other. "Franchise" is the grant from the state, of authority to occupy the streets; "licenses" are the designation by the council of the streets to be occupied; and "contracts" are the stipulated arrangements between the companies and the city, as to the manner of occupancy. Thus viewed, the effect of the validating clause is evident. The franchises dealt with being for the life of the act, the clause had the effect to validate them in the transferee, as if they had been granted in the first instance to such transferee, for the full period for which they were intended to run. Likewise the licenses were validated to the transferees as if they had been in the first instance issued to such transferees for the full period of the act. But the contracts looked only to the administrative and physical sides of the grant, and on that account covered shorter periods. The effect as to them of the clause under consideration, was to validate to the transferees these contracts, as if they had been entered into in the first instance with such transferees. In this way each contract was intended to be preserved within the life of the act, but according to its own terms as to time, as well as to subject-matter, as if the contract had originally been made with the transferee himself. The clause evidently was in the interest of business prevision, and thus interpreted, is intelligible, while if subjected to some of the interpretations suggested, it would be full of confusion and contrariety.

Holding, then, as we feel ourselves bound to hold, that the right to construct, maintain and operate street railways in the streets designated and to be designated, was a grant directly from the legislature, and that the period of such grant was the period named in the act for the life of the corporations, the next inquiry is, to what streets does the grant extend?

Counsel for the traction interests contend that the legislature had in mind a plan larger than the needs of the then immediate present; that the future growth of the city, and each of its divisions, was foreseen; that in contemplation of such growth a service was contemplated co-extensive therewith; that the legislature meant to provide for the then 'and future city, not distinct railways, but a system of street railways; and that upon the belief that they were obtaining a grant for such a system, the companies accepted the grant, and made their investments.

We have no doubt that, as a matter of fact, the legislature had in mind, as the practical outcome of its legislation, the development of a single railway system for each division of the city, co-extensive with the growth of the city, and pushing out its extensions and branches correspondingly as the residential belts of the city withdrew further and further from the business center; so that, no matter how large the city grew, no portion of its population would be without street railway facilities; and no matter how far the residential belts of the city retreated, the new districts would remain in the field tapped by the existing system. It is easy to see that such a practical purpose may have been the then public policy that lay at the basis of the grants.

But the question before us is not what practical outcome the legislature had in mind, nor what was the then prevailing public policy respecting long franchises and unified management. The question before us is, has the legislature, by contract, bound itself to the companies by a grant in præsenti, not only of the occupancy of such streets as were designated prior to the going into effect of the act of 1872, but also of such streets as have been occupied by the companies under ordinances since that act?

An inspection of the constitution of 1870, and the acts of the legislature following, shows that whatever may have been the contract, a departure therefrom as the grant is now interpreted by counsel for the companies, has been among the purposes of the law-making powers. The new constitution sets itself directly against special legislation, and corporations organized under special acts. It prohibits the further creation of corporations by special laws; or any grant by special law of a right to lay down railroad tracks; or any laws that, without requiring the consent of the local authorities, would, within such municipality, grant street railway rights. And the general assembly in 1872 passed a general city and village act, in which it was provided that the councils of cities organized under such act, should have power to permit, regulate, or prohibit the locating, construction or laying of any horse railroad in any street, alley, or public place, limiting such permission, however, to a period not to exceed twenty years.

It is our judgment that these provisions, taken together, embody, in the attempted form of law at least, the will of the people of Illinois that the efficient source of all the then future street railway grants shall be the municipality, not the legislature. They mark the origin in Illinois, in the form of public law, of that home rule policy respecting street railways that has since prevailed; and from that time forward, it must, in the absence of proof to the contrary, be presumed that the city council in the granting of the ordinance rights under consideration, intended, not simply to designate streets in pursuance of the acts of 1859 or 1865 as formerly, but out of its own full power over the subject-matter thus acquired under the law, to grant the full franchise, and to subject such grant to the limitations imposed. Unless, therefore, the grants of 1859, 1861 and 1865 are to be held to be contracts, not only as to streets designated prior to the time when the city of Chicago went under the city and village act, but as to all streets occupied since, under any ordinance of the council, the occupancy of such subsequently acquired streets does not fall within the legislative contract claimed. This brings us back to the question: Has the legislature, by contract, bound itself to the companies, by a grant in præsenti, that covers every street essential to the system rights claimed? Did the legislature, even with an admitted policy in mind, respecting a street railway system for Chicago, intend, in the acts of 1859 and 1865, to foreclose the people of Illinois, through subsequent legislatures, from putting into legal effect any change of such policy? We think not. It is not necessary to discuss the constitutional question involved, for in our judgment the grant does not, in legal effect or purport, extend to any such lengths. The grant involved is in the words following:

"Authorized and empowered to construct, maintain and operate a single or double track railway  *  *  *  in the city of Chicago, and in, on, over and along such streets  *  *  *  within the present or future limits of the south and west divisions, as the common council of said city have authorized said corporators, or any of them, or shall from time to time authorize said corporations, or either of them, so to do."

This is not, in terms, a grant of all the streets in the divisions named; nor is it in terms, at least, a grant of such streets as may be essential to the development of a system, or of the street railway facilities needed; nor is it, in terms, a grant of specified streets to take effect when the city council shall have made the required designation. Were terms like these to be found in the grant under consideration, it, like the railroad grant in Saint Paul & N. P. R. Co. v. Northern Pac. R. Co., supra, might, though in the nature of a float, be a grant in præsenti, relating back, when the streets were in fact designated, to the date of the grant.

In construing grants like these, substantial distinctions must not be lost sight of. The distinction between the railroad cases cited, and the claim under consideration, is both substantial and well marked. In the railroad cases, the line laid out was a specified line between specified termini, and the time for its completion and operation was a specified time not long in the future. Thus was definitely fixed—leaving only to the future the minor physical changes that actual surveys of the route might indicate—the exact physical property that constituted the consideration to be received by the people for the grant. But in the grant under consideration, if the contention of the companies is accepted, and the grant is made to reach the occupancy of streets in futuro, this prime essential element of the supposed contract—a consideration definite and specific—will be absent.

In the railroad cases, the land granted, and the location of the land, was with close approximation, named. The physical scope of the grant, subject only to its incidental minor changes, was thus predetermined. In the claim under consideration, to the extent that it relates to streets in futuro, the scope of the grant is left entirely in the air. No one could have foreseen how large the system would grow, or what streets, or what number of streets, would be regarded as essential to its development. It is unusual, to say the least, that parties should contract respecting a consideration and a subject-matter so wholly indefinite, inchoate, and in futuro.

In the railroad cases, the lines described were so definite that they furnished accurately, a basis for the investment; and the nature and extent of the field to be tapped was so fixed that it furnished an accurate basis for the calculation of the earning power that would follow. The railroad grants thus presented to investors a specific fiscal proposition, which in the very nature of railway properties, could admit of no diminution without changing the whole financial calculation. But, in the grant under consideration, it is evident that the investor calculated the value of his investment, not from what might be expected ten, twenty or forty years hence, but from what was to be immediately expected as the financial outcome of the lines actually laid down and operated under the licenses given. These, as we have already said, are substantial distinctions, differentiating clearly the grant under consideration, so far as it is claimed to relate to streets in futuro, from the railroad

grants passed upon by the Supreme Court. Besides, if the legislature had intended to put under contract so large a domain of the unknown and the future as counsel claim, apt words could have been found in which to embody such intention. Here again, we repeat, the absence of the words implies the absence of the intention.

To the extent that the city council, in virtue of the acts of 1859, 1861 and 1865 designated streets on which these grants should act, such designation being acted upon by the companies, the grants are contracts within the meaning of the constitution of the United States. But beyond that, the contract character does not extend. When the legislature, by the act of 1872, delegated to the city plenary power to grant or withhold franchises, and the city entered upon the exercise of that power, the accepting of ordinances, and the making of investments thereon, was, in our judgment, no longer done on the faith of the legislative grant, and is no longer controlled by the terms of that grant.

We do not hold that the state may not, if it so elects, make a grant as broad as the one claimed. We do not hold that such a grant would not, within the meaning of the constitution, be impaired by the change of law embodied in the act of 1872. What we do hold is, that no such legislative intention should be implied where it does not clearly appear, and that in the legislative grants before us, no such intention satisfactorily appears.

But two other questions, of the many argued, need be noticed. It is insisted that the act of 1865 does not extend to the life of the north side grants. Read in the light of the subject-matter dealt with, it is our judgment that the act of 1865 was intended to carry into the act of 1859, all of the amendments, precisely as if the act of 1859 had been re-enacted in full, with the amendments substituted for the old matter amended.

Some question was also made at the argument as to whether the ordinance granting the use of Wells street was passed after or before the city had come under the city and village act. The city voted to change from the special to the city and village charter April 23, 1875; the Wells street ordinance was passed April 26, 1875; and subsequent to this, the vote was counted and declared. The question raised is, whether the city was under the city and village act from the date of the vote, or from the date of the time when the vote was counted and declared. It is our judgment that the city went under the general city and village act, not on the date when the vote was taken, but on the date when it was counted and declared; from which it follows that the Wells street ordinance was not a franchise granted by the city, but a license issued in pursuance of the acts of 1859 and 1865.

To sum up our conclusions in one paragraph, we hold, that as to such ordinances as were passed by the city council prior to the counting of the vote at the charter election in 1875, and accepted and acted upon by the railway companies, there exists, between the companies and the city, a contract relation, terminable by neither party without the consent of the other, until the period named in the legislative acts expires; but that as to streets occupied under ordinances passed after that date, the contract relation is to be looked for solely in the ordinances themselves. Upon these legal predicates, the status of the particular streets affected is easily ascertainable.